**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 26 2002**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

VERA BRESSLER; MARIAN BROWN; ANNINE WYCHERLEY; JOY MILLS, individually, as rightful directors and members of American Federation of Human Rights, Inc., and on behalf of the other American Federation members who have not seceded from International Co-Masonry,

      Plaintiffs - Appellants,

JAMES E. VOIROL, for himself and all Shareholders/Members similarly situated,

      Plaintiff - Counter-Defendant - Appellant,

and ORDER OF INTERNATIONAL CO-FREEMASONRY LE DROIT HUMAIN AMERICAN FEDERATION,

      Plaintiff - Counter-Defendant,

v.

AMERICAN FEDERATION OF HUMAN RIGHTS, a Colorado non-profit corporation; ROSARIO MENOCAL; YVONNE HALEY; MAXIMO CUMSILLE; NORBERT ORSZULA; JOHN SCHWARZ,

      Defendants - Counter-Claimants - Appellees.

No. 99-1581
(D.C. No. 94-WM-653)
(D. Colorado)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE** and **McWILLIAMS**, Circuit Judges, **JENKINS**, Senior District Judge.[**]

Plaintiffs brought this civil action within the district court's diversity jurisdiction, 28 U.S.C. § 1332 (2000), seeking to impose a trust upon certain property of the American Federation of Human Rights, a Colorado non-profit corporation, and to require an accounting by the defendant corporate directors, as well as damages, injunctive relief and attorney's fees pursuant to principles of Colorado law governing property disputes within fraternal and religious societies.[1] Defendants counterclaimed, seeking damages, injunctive relief and attorney's fees based upon allegations of civil conspiracy, unlawful restraint of trade, and breach of fiduciary duty.

---

[*]This order and judgment is not binding precedent, except under the doctrines of res judicata, collateral estoppel, and law of the case. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**]The Honorable Bruce S. Jenkins, United States Senior District Judge for the District of Utah, sitting by designation.

[1]Plaintiffs also sought appointment of a receiver, which the district court denied. *See* Order, filed April 25, 1994, *Voirol v. American Federation of Human Rights*, Civil No. 94-B-653 (Appellants' Appendix, vol. I, at 29-34.) The parties have furnished a four-volume Appendix ("App.") and a two-volume Addendum of exhibits, transcripts, and other materials extracted from the record on appeal. This court will cite to the Appendix by volume and page number ("App. vol. ___, at ___"), the Addendum by volume, tab and page number ("Addendum vol. _, tab _, at ___").

By an Order dated April 10, 1997, the district court dismissed the claims of the plaintiff "Order of International Co-Freemasonry Le Droit Humain, American Federation" for lack of standing, retaining the named individual plaintiffs as parties (Vera Bressler; Marian Brown; Annine Wycherley; Joy Mills, and James E. Voirol, hereinafter "the Bressler Plaintiffs"). The parties' various claims were tried to the district court without a jury during the week of April 14, 1997. On November 18, 1999, Judge Walker D. Miller entered His Findings, Conclusions and Order ("FC&O") dismissing the Bressler Plaintiffs' complaint with prejudice, granting judgment for nominal damages against plaintiffs Bressler and Voirol on defendants' civil conspiracy claim, and dismissing the remaining counterclaims with prejudice. All requests for attorney's fees were denied.

Plaintiffs appealed, filing a timely notice on December 14, 1999. This court has jurisdiction of this proceeding pursuant to 28 U.S.C. § 1291 (2000).

**FACTUAL BACKGROUND**

**The Freemasons**

Freemasonry, the largest and most widely established fraternal order in the world today, enjoys a long and colorful history. Rich in tradition and ritual, Freemasonry's roots run deep. Born of the guild system of medieval Europe, Freemasons first shared a common craft—stonecutters—but soon embraced members from various backgrounds who shared common ideals—fraternity, equality, peace, truth, virtue, enlightenment. Members gathered at their "lodges" (usually taverns and alehouses) to lend mutual aid

-3-

and support, first to each other, and later, to all of humanity.  Lodge meetings became social rather than business occasions, and on St. John the Baptist's Day, June 24, 1717, at the Goose and Gridiron alehouse, four lodges in London joined in forming a "Mother Grand Lodge of the World," soon to be known as the Grand Lodge of England, and elected their first Grand Master.  Norman Davies, *Europe: A History* 633 (1996).  This first Grand Lodge became the wellspring of Masonic organization and practice for all Masonic orders and lodges thereafter established in the United Kingdom and elsewhere in the world.

Freemasonry flourished in Eighteenth Century Europe, where it enjoyed the generous patronage of many among the aristocracy and the nobility of Prussia, Austria and France, and growing popularity among intellectuals and musicians. Voltaire became a Freemason at age 83.  Haydn was a Freemason, as was Mozart, whose 1791 opera *Die Zauberflöte (The Magic Flute)* celebrates Masonic values, symbolism and imagery.  *See* Jasper Ridley, *The Freemasons: A History of the World's Most Powerful Secret Society* 112, 113-14 (2001); Jacques Chailley, *The Magic Flute Unveiled* (1971).

The history of Freemasonry intersects the history of our own Nation as early as the colonial and revolutionary eras.  Benjamin Franklin was an enthusiastic Freemason, active for many years.  Other Freemasons present at the founding of the Republic included George Washington, John Hancock, Paul Revere, and John Paul Jones.  Ridley, *supra*, at 108-09.

Early in its history, Freemasonry laid claim to secret knowledge of great antiquity, to be shared only among its initiates.  William Hutchinson, a Freemason writing in 1775, declared, "There is no doubt that our ceremonies and mysteries were derived from the rites, ceremonies, and institutions of the ancients, and some of them from the remotest ages."  William Hutchinson, *The Spirit of Masonry* 62 (rev. ed. George Oliver 1982).  Freemasons share the Pythagoreans' affinity for triangles and geometry, *id.* at 71-79 & n.11, 148-54; they embrace a doctrine of "Inner Light" that some ascribe to ancient Egypt at the time of the pyramids, or civilizations even older;[2] they find meaningful allegory in the building of the Temple of Solomon in Jerusalem; and they subscribe to "Mysteries," or bodies of esoteric knowledge,[3] attributed to ancient Egypt, Greece, and Jerusalem, as well as to the tradition of the Holy Grail.  *See generally* W. Kirk MacNulty, *Freemasonry: A Journey Through Ritual and Symbol* (1991); Arthur E. Waite, *A New Encyclopaedia of Freemasonry* (1970); Albert G. Mackey, *The Symbolism of Freemasonry* (1869); *cf.* Christopher Knight & Robert Lomas, *The Hiram Key* (1996).

---

[2] C.W. Leadbeater, *Glimpses of Masonic History (Freemasonry and its Ancient Mystic Rites)* (1926).

[3] "Mystery" in Masonic usage may refer to "an antique body of knowledge, traditionally carefully hidden, which provides instruction touching on the fundamental nature of humankind."  W. Kirk MacNulty, *Freemasonry: A Journey Through Ritual and Symbol* 6 (1991).  Mackey speaks of the "secret worship, or Mysteries, of the ancients."  Albert G. Mackey, *The Symbolism of Freemasonry* 43 (1869).  It has also been understood to refer to "organizations . . . which, under the vail of mystery, sought to illustrate the sublimest truths of religion, morality and virtue, and impress them on the hearts of their disciples."  Robert Macoy, *A Dictionary of Freemasonry* 257 (reprint ed. 2000).  Herodotus writes of the Egyptians and their ceremonial representation of the sufferings of Osiris, "this representation they call their Mysteries."  Herodotus, *The Histories* bk. II, ch. 171 (George Rawlinson, trans. 1910).

They speak of "great secret systems of the Mysteries" or "'noble orders of architecture,' *i.e.*, of soul-building" found in many cultures, and posit that "behind all the great moral movements and developments in the history of humanity, have stood what St. Paul called the keepers or 'stewards of the Mysteries,'" from whom issued "modern speculative Freemasonry." Walter L. Wilmshurst, *The Meaning of Masonry* 23, 24 (5th ed. 1927).[4]

Freemasonry has often been described as "'a science of morality, veiled in allegory and illustrated by symbols.'"[5] Starting with the essential compass, square and volume of sacred law,[6] a "very rich and complex symbolic structure" plays a central role in Masonic study and practice:

---

[4]Wilmshurst goes on to say:

> All that I wish to emphasize at this stage is that our present system is *not* one coming from remote antiquity: that there is no direct continuity between us and the Egyptians, or even those ancient Hebrews who built, in the reign of King Solomon, a certain temple at Jerusalem. What *is* extremely ancient in Freemasonry is the spiritual doctrine concealed within the architectural phraseology; for this doctrine is an elementary form of the doctrine that has been taught in all ages, no matter in what garb it has been expressed.

*Id.* at 25 (emphasis in original).

[5] Albert G. Mackey, *The Symbolism of Freemasonry* 10 (1869), *available at* http://www.hti.umich.edu/cgi/t/text/text-idx?c=moa;idno=AHK6822.

[6]    The Three Great Lights in Masonry are the Volume of Sacred Law, the Square and the Compasses, and the sacred writings are understood to be those revered by the individual Mason. Although there are local variations in Freemasonry's symbolic structure, the Three Great Lights are universal. Taken together they form the most essential, as well as the most widely known, of the Masonic symbols. No Masonic Lodge can meet unless they are present and displayed.

MacNulty, *supra*, at 4.

> [t]he Candidate for Masonry is introduced to that symbolic structure by participating in the ritual dramas, called "Degrees," through which Freemasonry communicates its teaching of morality. The symbols are drawn, in part, from the practices of the medieval stone masons' guilds; and as part of the task of administering Masonic activities the Grand Lodges perform a role as the custodian of those symbols. In practice, the Grand Lodges preserve this body of symbolism and protect it from change; . . . .

MacNulty, *supra*, at 6; *see also* Daniel Beresniak & Laziz Hamani, *Symbols of Freemasonry* (2000).

The Freemasons have adopted various systems, or "rites," governing the personal advancement of members through the progression of hierarchical "degrees."[7] The popular "Scottish Rite," for example, delineates a progression from 4° to 32° based upon a member's mastery of prescribed lessons teaching Masonic values and principles, among them faith, hope, universal benevolence, trustworthiness, fidelity, integrity, religious tolerance, the dignity of labor, and duty to family, country, and God. *See generally* Albert Pike, *Morals and Dogma of the Ancient and Accepted Scottish Rite of Freemasonry* (1906).

"Operating in an aura of secretiveness and symbolism, the masonic lodges fostered a curious mixture of medieval mysticism and modern rationalism." Mortimer Chambers, et al., *The Western Experience* 642 (3d ed. 1983).

> The air of mystery surrounding freemasonry is deliberately cultivated. It is attractive to sympathizers, offensive to opponents. Non-

---

[7]These forms may trace to the Ismaili Muslims of Eleventh-Century Egypt and North Africa, who gathered into "a Grand Lodge of complex initiations and hierarchical degrees." Will Durant, *The Age of Faith* 289 (1950).

initiates are left guessing about its rituals, its hierarchy, its pseudo-oriental jargon, its signs and symbols, and its purposes. The compass and square, the apron and gloves, and the circle on the floor are obviously designed to encourage belief in the movement's medieval guild origins. . . .

Davies, *supra*, at 633.

It has been observed that Freemasonry is "a science—a philosophy—a system of doctrines which is taught, in a manner peculiar to itself, by allegories and symbols,"[8] that it is "essentially an educational society, attempting to teach its members a moral philosophy of life,"[9] and that it offers a "special way of living expressed through symbols and dramatic stories" that "points the way to self-improvement through service to others."[10]

American Freemasons today make up about three-fourths of the total number of all members throughout the world. As American Freemasons, all of the parties to this case share in this esoteric tradition.

**Co-Freemasonry & the American Federation of Human Rights**

Many Masonic orders and lodges admit only males as members. Often, women in American Masonic families participate in the affiliate "Order of the Eastern Star," an organization well known for promoting many charitable activities, but do not become

---

[8]Mackey, *supra*, at 10.

[9]"Freemasonry," *Microsoft® Encarta® Encyclopedia 2000* (CD-ROM ed. 1993-99).

[10]Le Droit Humain—American Federation,"What is Freemasonry?", *at* http://www.comasonic.org/ faqaf.html (last modified March 14, 1999).

members of Masonic lodges themselves. "Co-Freemasonry" distinguishes itself from other Masonic traditions by its inclusion of women as well as men as members of the lodge on an equal footing.

### *The International Order*

The Order of International Co-Freemasonry Le Droit Humain (L'Ordre Maçonnique Mixte International le Droit Humain) ("the International Order") traces its own particular origin to Nineteenth Century France:

> In 1882 a woman named Marie Deraismes was initiated into a French masculine Lodge called appropriately "Les Libres Penseurs" (The Free Thinkers). In 1893, Dr. Georges Martin, a French Senator and advocate of equal rights for women, joined Marie Deraismes and other male Masons in founding in Paris *La Respectable Loge, Le Droit Humain, Maconnerie Mixte* (Worshipful Lodge, Le Droit Humain, Co-Masonry). They initiated, passed, and raised sixteen prominent French women.

Le Droit Humain—American Federation, "When and how did Co-Freemasonry begin?" *at* http://www.comasonic.org/faqaf.html (last modified March 14, 1999); *see also* Ordre Maçonnique Mixte International "Le Droit Humain," *Rapide Historique de l'Ordre International Mixte "Le Droit Humain," at* http://www.droit-humain.org/ (April 12, 1998) (in French).

Another text recounts that the *Les Libres Penseurs* Lodge, "belonging to a then recognized Masonic Obedience,"

> decided to initiate a woman, a certain Mdlle. Maria Deraismes, a well-known authoress and lecturer, noted for her service to humanitarian and feminist movements. They did so, in the presence of a large assembly, on January 14th, 1882. The Right Worshipful Master, Bro. Houbron, 18°,

justified their experiment as having the welfare and highest interests of humanity at heart, and as being a perfectly logical application of the principle of 'A Free Mason in a Free Lodge.' The Lodge was of course suspended for putting the family motto into practice. . .

For some time Sister Maria Deraismes did nothing in the way of extending to others the Masonic privileges she had received. Eventually she yielded to the persuasion of friends, and notably of Dr. Georges Martin. This latter gentleman was a member of the Lodge *Les Libres Penseurs* when Mdlle. Desraimes was initiated. He gave her his staunch support and the benefit of his wide Masonic experience throughout her Masonic career. . . . On March 14th, 1893, Sister Desraismes initiated a number of ladies, in the presence of Dr. Martin, and on April 4th of the same year *La Grande Loge Symbolique Ecossaise de France, Le Droit Humain*, came into being. . . .

In 1900, the new Grand Lodge, with a view to extending its ramifications into other countries, found it desirable to work the higher degrees. Aided, therefore, by Brethren in possession of the 33° the body was raised from a Craft Grand Lodge to a Supreme Council of the Ancient and Accepted Scottish Rite. . . .

J. I. Wedgwood, *Universal Co-Freemasonry: What is it?, quoted in* Leadbeater, *supra*, at 192-93. In so doing, the International Order gained its independence from other Grand Lodges or Obediences, while at the same time reaffirming its commitment to preserve and maintain Masonic traditions:

Co-Masonry, a new Obedience independent of all others, has not created a new Rite. That which distinguishes it from other existing Obediences is that, instead of admitting men only to its ranks, it admits women on an equal footing. It proclaims equal rights for both sexes and absolute liberty of conscience; and it demands, in order to secure to everyone unlimited freedom in the search for truth, the utmost tolerance from all members. It avoids political and religious discussions wherever these cannot be carried on with the requisite tolerance and moderation; it welcomes everyone who is free and of good report, whatever may be his convictions in matters religious or philosophical.

("Foreword," in *Constitution By-Laws and Rules and Regulations of the American Federation of Human Rights* 1 (5th ed. 1977), Addendum vol. I, tab 2, at 22.)

The International Order's organic document is its International Constitution,[11] which binds all members, who from and after their initiation pledge to obey its principles and rules. The International Constitution proclaims its commitment to gender equality, establishes a Supreme Council as "the supreme governing body of all Lodges, Chapters, Areopagi, Tribunals, Consistories, Grand Councils of the 33rd degree, Jurisdictions and Federations" of the International Order, and vests the Supreme Council with "special duties and prerogatives"

> [t]o establish Lodges of all degrees; to control the principles enunciated and the rituals practiced by such Lodges; to enforce the International Constitution; to prepare and to issue International Means of Recognition and Masonic Passports; to settle in the last resort, all matters in such a way as to ensure the stability and progress of the Order.

(International Constitution, Art. 18 [Ch. IV, Art. 1],[12] Addendum, vol. I, tab 1, at 3, App. vol. I, at 164.) Indeed, "To the Supreme Council alone is entrusted the preservation of the principles" of the International Order. (*Id.* Art. 17 [Ch. III, Art. 3], Addendum vol. I, tab 1, at 3.) The Supreme Council may "create and establish Lodges in countries where none

---

[11](Addendum vol. I, tab 1, at 1-17, App. vol. I , at 162-77, 286-302.)

[12]The text of the International Constitution as furnished in this record is printed with an original "chapter-article" numbering scheme, but is accompanied by amendments which, *inter alia*, renumber all of the articles in a continuous sequence. In this Opinion, articles are cited by their new consecutive number with the corresponding chapter-article reference given in brackets, *e.g.*, Art. 77 [Ch. 15, Art. 2], and where applicable, the amended text is quoted, *e.g.*, Art. 45.

exist," may "establish Federations in countries applying for them," may "issue Charters of Constitution for all Lodges . . . Grand Councils of the thirty-third degree and for Federations," and "possesses the right to revoke the charter of any Lodge or Federation for just and sufficient cause." (*Id.* Arts. 19, 23 [Ch. IV, Arts. 2, 6].) The Supreme Council is also empowered "[t]o accord the 31st, 32nd and 33rd degrees to brethren," and "[t]o authorise, after due inspection, the Rituals and National Regulations of Federations." (*Id.* Arts. 20, 21 [Ch. IV, Arts. 3, 4].)

### *The American Federation of Human Rights*

Co-Masonry was first introduced in the United States by Louis Goaziou, a French immigrant and coal miner who came to Pennsylvania in 1880 and with Antoine Muzzarelli, a representative of the International Order's Supreme Council, began organizing lodges there in 1903.[13] On August 7, 1907, the American Federation of Human Rights was incorporated in the District of Columbia, and in November of 1908, at a convention called by Professor Muzzarelli, Goaziou was elected the federation's first President. A year later he was appointed Representative of the Supreme Council of the International Order, and a Certificate of Re-Incorporation was registered by the Federation on May 26, 1909:

> The particular business and objects of this society are to demand
> equal rights for both sexes before the law, to labor according to the

---

[13](*See* Order of International Co-Freemasonry Le Droit Humain, "Abbreviated history of the American Federation," in *International Bulletin No. 1* (1st semester, May 1992), App. vol. I, at 189-90.)

Constitution and General By-Laws to be made and adopted by the society for the mutual improvement of its members by combating ignorance under all its forms, the building up of human character, the practice of solidarity, the upholding of high standards of honor, and of social justice with a kindly feeling towards all, and a ceaseless endeavor to promote the moral and material welfare of the human race, and to that end, to organize and to conduct throughout the United States of America, branches or Lodges of Co-Masonry under the authority or jurisdiction of the Supreme Council of universal Co-Masonry with headquarters in Paris, France.

(Certificate of Re-Incorporation, dated May 18, 1909, at 1, Addendum vol. I, tab 2, at 27.)

On January 20, 1910, the Supreme Council of the International Order issued a Charter to the American Federation of Human Rights under which Goaziou and other members of Co-Masonic lodges in the United States

are by the present Constitutive Charter, duly signed and sealed, authorized to form the American Federation of Human Rights, a legal Corporation, to administer and direct the Financial affairs of Co-Masonry in the United States under the authority of an accredited Representative of the Supreme Council.

This Federation will enjoy from this day forward, all the prerogatives resulting from the present Charter, the officers having promised to respect the Constitution and General Regulations of the Order and to cause the members of the Federation to respect them, and having sworn fidelity to the Supreme Council of Universal Co-Masonry through its accredited Representative.

(Addendum, tab 3, at 77.)

A tract of land located in Larkspur, Colorado was purchased in August of 1916, and soon became the site of AFHR's administrative headquarters.

Due to a lapse in filing of required reports, the 1909 corporation was no longer in good standing by 1974, when a question arose concerning whether the 1909 corporation

could qualify to do business in Colorado and AFHR could thereby purchase a parcel of real property (the "Grove Property") in the name of the Federation; it appears a title insurance policy could not issue to AFHR because the corporation was not in good standing. (*See* Letter from Freda M. Cadwalader, dated September 25, 1974, Addendum, vol. I, tab 5, at 83.) To correct this problem, the American Federation of Human Rights ("AFHR") was again reincorporated in 1975, this time in Colorado, where AFHR's national headquarters is located. AFHR's Articles of Re-Incorporation echoed the broad corporate purposes declared in the 1909 certificate, but with some significant modifications:

> Among other things, the particular business and objects of this society are to demand Equal Rights for both sexes before the law, to labor according to the Constitution and General By-Laws to be made and adopted by the society for the mutual improvement of its members by combating ignorance under all its forms, the building up of human character, the practice of solidarity, the upholding of high standards of honor, and of social justice with a kindly feeling towards all, and a ceaseless endeavor to promote the morals and material welfare of the human race, and to that end, to organize and to conduct throughout the United States of America, branches or Lodges "of fraternal helpfulness through the study of ritualistic forms in groups of members, known as Lodges, with income derived from fees and dues and contributions through the groups of members known as Lodges and voluntary donations by members in addition to assessments, all on a non-profit basis". Co-Masonry under the authority or jurisdiction of the Supreme Council of universal Co-Masonry with headquarters in Paris, France.

(Articles of Re-Incorporation, filed March 11, 1975, Addendum vol. I, tab 2, at 28.)

AFHR was re-incorporated pursuant to the laws of the State of Colorado governing non-profit corporations.

The International Order's Supreme Council approved these new 1975 Articles on May 27, 1979, together with AFHR's By-Laws as adopted and ratified by its members in 1974, and its Rules and Regulations.[14]  As was the case with the 1907-09 incorporation in the District of Columbia, the AFHR corporate entity came into legal existence prior to any action by the International Order approving, authorizing or ratifying the creation of the AFHR.

AFHR's By-Laws provided for corporate governance by a Grand Council of Administration:

> ARTICLE III
> Section 1.
> Administrative duties and financial responsibilities comparable to those of Trustees and Boards of Directors of similar corporations are vested in the Grand Council of Administration, which shall consist of the four elected Officers of the Federation and the Representative of the Supreme Council (or his Deputy if the Representative and the President are the same person.)  The Representative of the Supreme Council is entitled to a vote on this Grand Council.
>
> Section 2.
> The Grand Council of Administration shall be responsible for the welfare of the Federation and the proper conduct of its business.

(Memorandum, dated July 30, 1992, Addendum vol. I, tab 23, at 112; AFHR By-Laws, Art. III, Sec. 2, Blue Book at 20, Addendum vol. I, tab 2, at 32.)  Of particular significance to the issues raised on this appeal is Article VIII, Section 1 of the AFHR By-

---

[14]AFHR's organic documents—its Articles, By-Laws, Rules and Regulations and Charter—have been collected in a single bound volume known to members as the "Blue Book."  (*See Constitution By-Laws and Rules and Regulations of the American Federation of Human Rights* (5th ed. 1977) ("Blue Book"), Addendum, tab 2, at 18-75; App. vol. I, at 82-138, 229-85.)

Laws: "The Grand Council of Administration shall have exclusive control of all funds and properties of the Federation." (*Id.* Art. VIII, Sec. 1, Blue Book at 23, Addendum vol. I, tab 2, at 33.)

Following the example of Louis Goaziou, it was not unusual for the AFHR President to also serve as the Representative of the International Order's Supreme Council, until a controversy arose concerning the administration of Calla Haack, the Supreme Council's Representative and AFHR's President beginning in 1985. Ms. Haack purportedly had overseen the investment of AFHR funds in "junk bonds," a dubious investment strategy that ultimately led to her resignation in 1991.

### *AFHR and the By-Laws Amendment Controversy*

In the wake of the Calla Haack controversy, the Supreme Council (through its Acting Representative) invited AFHR to consider amending its By-Laws to remove its Representative from AFHR's Grand Council of Administration and to bar the Representative from simultaneously serving as AFHR President. (Ballot Packet, dated July 30, 1992, Pltfs' Exh. 47, Addendum, vol. I, tab 23, at 111.) It was proposed to amend Article III, Section 1 of the AFHR By-Laws to read:

> Administrative duties and financial responsibilities, comparable to those of Trustees and Boards of Directors of similar corporations, are vested in the Grand Council of Administration, which shall consist of five elected Officers of the Federation. The Representative of the Supreme Council is entitled to attend meetings and express opinions, but may not vote.

(*Id.* at 112.) It was also proposed to amend Article IV, Section 1 of the By-Laws to read:

"The President, Vice President and [two] three Directors shall be elected by members of the Third Class in good standing every five years. They may be re-elected." (*Id.* at 113 (emphasis added).) The proposed amendments were put to a vote of the Third Class (or Master Masons) of AFHR members as provided by Article XII of the By-Laws,[15] and were adopted by an overwhelming margin.[16]

In September 1992, following the vote on the amendments, the Supreme Council appointed Vera Bressler as its new Representative, replacing Calla Haack.[17] The Bressler appointment also occasioned some controversy, as the AFHR's North American Consistory had voted on a slate of three proposed representatives, and Ms. Bressler drew

---

[15]     ARTICLE XII—AMENDMENTS

Section 1.
    These By-Laws may be altered by sixty per cent of the valid votes received of the members of the Third Class in good standing.

Section 2.
    Proposals to change may be submitted to the President by two members of the Grand Council of Administration acting together for that purpose, or by petition signed by fifty members of the Third Class in good standing of the Federation. The President shall then proceed as provided in Article XI, entitled "Referendum".

[16]According to the district court, the amendments passed by 173-12 and 175-10, respectively. (FC&O at 9 n.7, App. vol. II, at 395.)
    In August of 1992, AFHR's North American Consistory voted to adopt similar amendments to AFHR's Rules and Regulations; these amendments were approved by a wide margin. (Ballot Packet, dated August 5, 1992, Pltfs' Exh. 48, Addendum vol. II. Tab 24, at 115-18; Letter of Rosario G. Menocal to Joy Mills, dated August 30, 1992, Pltfs' Exh. 50, Addendum vol. I, tab 26, at 120-21.)

[17](*See* Addendum, vol. I, tabs 27-28, at 123-24; Transcript of Trial, dated August 15, 1997, at 372:1-7 (testimony of Joy Mills), App. vol. III, at 840.)

less than 20 per cent of the vote.  (*See* Letter of Rosario Menocal, dated October 15, 1992, Pltfs' Exh. 57, Addendum, vol. I, tab 29, at 126-27.)

In January 1993, the By-Law amendments were forwarded to the Supreme Council for approval.  In September 1993, the Supreme Council, making a curious about-face, responded by proffering its own additional amendments, including another amendment to Article III of the By-Laws providing that "[h]owever, the decisions taken by the Grand Council of Administration may be enforced only if the [Representative] do[es] not refuse them," and that AFHR board members may not serve for successive terms.

As the district court found, "This tortured language or translation was interpreted by Ms. Bressler . . . to grant a veto power . . ."  (FC&O at 9, App. vol. II, at 395.[18])  She urged the AFHR members to adopt that change under threat of revoking AFHR's status as a federation under the International Constitution, relegating AFHR to the status of a "jurisdiction" under the direct control of the Supreme Council:

> Minutes of the September 1993 meeting of the Supreme Council have been received. . . .
>
> An excerpt from the minutes reads: "should these amendments be refused, the American Federation would be changed into a Jurisdiction with the consequences resulting from it."
>
> We should realize that a Jurisdiction has no Constitution.  Therefor[e], should the American Federation become a Jurisdiction, the Constitution would automatically become null and void.  Is this what we want?

---

[18]AFHR's legal counsel likewise opined that "[t]he kind of change requested by the Supreme Council essentially gives the Council a veto power."  (Letter from James C. Bull to Max Cumsille, dated November 29, 1993, Pltfs' Exh. 75, Addendum, vol. I, tab 43, at 149.)

> *The Grand Council of Administration would automatically cease to exist.*
> The American Federation would come directly under the Supreme Council
> of Le Droit Humain. . . .
>
> According to the edict of the Supreme Council, and *since the
> [Representative] is the final authority in the Federation, referendums are
> out of order* and not recognizable unless first approved by the
> [Representative].

(Letter of Vera Bressler, dated November 29, 1993, Pltfs' Exh. 74, Addendum, vol. I, tab

42, at 148 (emphasis added); FC&O at 9 n.7, App. vol. II, at 395.)

Of course, as the district court observed, AFHR is a Colorado nonprofit

corporation and is therefore a creature of Colorado law and its own organic

documents—not of the International Order, its Supreme Council, or its Representative.

The dire consequences threatened by Ms. Bressler and the Supreme Council—particularly

those set forth above in italics—ignore both AFHR's By-Laws and the Colorado law

pursuant to which they were adopted.[19]

Interpreted as such, however, the new amendments confronted AFHR and its

members with a dilemma: if they adopted the new amendments, corporate governance

would ultimately vest in an individual appointed from outside AFHR—an individual that

---

[19]The suggestion that AFHR's Grand Council of Administration "would automatically cease to exist" runs contrary to the mandate of AFHR's By-Laws that "[a]dministrative duties and financial responsibilities comparable to those of Trustees and Boards of Directors of similar corporations are vested in the Grand Council of Administration," as well as the Colorado statute requiring that the corporation be managed by a board of directors, elected by the members or appointed in the manner provided in the articles of incorporation or bylaws. *See* Colo. Rev. Stat. §§ 7-24-101(1), 7-24-103(3) (1973) (repealed 1998). In effect, the Supreme Council was arrogating to itself the power to nullify AFHR's corporate existence.

the Supreme Council had insisted at the same time should *not* sit on AFHR's board and should not be AFHR's President. On the other hand, if they declined to adopt the new amendments, the Supreme Council and its Representative, Vera Bressler, threatened the drastic consequences outlined in her letter.

AFHR's voting members—the Bressler Plaintiffs among them—were plainly apprised of this threat at the time that they voted on the 1993 proposed amendments. While they had supported the 1992 amendments, AFHR's incumbent directors openly opposed the Supreme Council's 1993 proposals, and those amendments were soon rejected by 68 per cent of the members who cast votes (nearly 70 per cent of the eligible members). (FC&O at 9-10, App. vol. II, at 395-96.)

On January 3, 1994, when AFHR President Rosario G. Menocal announced the results, the die was cast. (Letter of Rosario G. Menocal, dated January 3, 1994, Pltfs' Exh. 81, Addendum, vol. I, tab 49, at 169.) With nearly detached understatement, President Menocal advised the voting members: "The situation in which the members of the American Federation find themselves today, due to the letters sent to the members by The Very Ills. Bro. Bressler, needs to be defined." (*Id.*) As the district court found,

> The President of AFHR then sent a letter to the leader of the International Order (Grand Master) explaining AFHR's status as a Colorado non-profit corporation and its need to comply with its own bylaws (requiring approval of amendments by 60% of the voting membership) and informing him that approximately two-thirds of the membership rejected the dictated changes. Ex. GG. In an effort to resolve the issues, the board obtained an audience with the Grand Master in Paris on January 20, 1994. Ex. 81 and 82. The board's entreaties were rejected by the Permanent

Commission of the Supreme Council—which included Ms. Haack and Ms. Bressler. The uncontested testimony is that the Grand Master declared that the defendants would have to abide by the Council's demand regardless of Colorado law. . . .

(FC&O at 11, App. vol. II, at 397.)

The meeting was to no avail.

Following the January 20, 1994, meeting, the defendant AFHR Directors conferred among themselves, and then returned to the United States, where they mailed letters to the International Order and to AFHR members expressing their intention to operate independently of the International Order. (Letter from Rosario G. Menocal, dated January 20, 1994, Addendum, vol. II, tab 51, at 172; Letter from Rosario Menocal, et al., dated January 21, 1994, Pltfs' Exh. 85, Addendum, vol. II, tab 53, at 174-75.) The AFHR board advised AFHR's membership of the board's intention to "proceed as 'an obedience independent from Le Droit Humain, working all degrees from the 1st through the 33rd.'" (*Id.*)[20] As the district court found,

> The reaction of the Supreme Council was to dismiss the defendants from the International Order as a "clandestine" order, albeit in legal possession of the American Federation's assets. Ex. JJ. The Supreme Council withdrew the charters of all lodges and "higher bodies in the

---

[20]At this point, the Bressler Plaintiffs argue, AFHR's incumbent directors—the individual defendants-appellees—"met together secretly" and plotted to secede from the International Order, "seize control of AFHR's property," and establish "a new 'American Co-Masonry'" under their governance. (Appellants' Opening Brief at 20.) "Then, in order to implement their secession," the Bressler Plaintiffs aver, "the directors also purported . . . to unilaterally amend the AFHR bylaws, without referring the matter to a vote of members, so as to remove the Supreme Council's authority to approve members, and to usurp this power for themselves." (*Id.* (citing Addendum, tab 52, at 173; App. vol. II, at 577-79, App. vol. IV, at 1389).)

Federation" until certain conditions were met, including a pledge not to belong to the "clandestine order at Larkspur" and the signing of a "reaffirmation of loyalty"which pledged the individual member "to support, maintain, respect and obey the International Constitution of the Order and the rules and decisions of the Supreme Council and its Representative." Ex. JJ.

With regard to the property of the Colorado corporation, the Supreme Council designated Ms. Bressler as its representative with "the power of taking all helpful conservatory steps on personal and real estate of the American Federation of Le droit Humain (American Federation of Human Rights) . . . ." Ex. 89. Acting with that putative authority and as MPGC, she appointed other plaintiffs as board members and officers of AFHR (plaintiff Voirol was named President). These actions were without any vote of the membership to remove the existing directors (the individual defendants) or to elect the purported new directors. . . .

(*Id.* at 11, App. vol. II, at 397.)[21] In December of 1994, Bressler, Voirol and others also organized a new corporation, incorporating under Delaware law as the "Order of International Co-Free-Masonry Le Droit Humain — American Federation." (*See* Certificate of Incorporation, dated December 27, 1994, Pltfs' Exh. 99, Addendum vol. II, tab 62, at 20-03; "Order of International Co-Freemasonry "Le Droit Humain, Constitution, By-Laws and Rules and Regulations of the American Federation," Pltfs' Exh. 100, Addendum vol. II, tab 63 at 204-49.)

AFHR's disaffiliation was subsequently confirmed by a March 13, 1995 letter signed by senior officers of the International Order, stating that "[t]he only Masonic

---

[21]The reference to "MPGC" denotes the Co-Masonic title of "Most Puissant Grand Commander," or M ∴P ∴G ∴C ∴, conferred on the Representative of the Supreme Council when he or she is also a member of the Supreme Council. (*See* FC&O at 6 n.5, App. vol. II, at 392; Rules and Regulations, Art. 103, Blue Book at 88, Addendum vol. I, tab 2, at 66.)

Association for America with whom the Order of International Co-Masonry 'Le Droit Humain' has any relationship with is "The Order of International Co-Freemasonry Le Droit Humain – American Federation"—the Bressler Plaintiffs' new Delaware corporation.  (App. vol. I, at 205, 206.)

This litigation ensued.

**QUESTIONS PRESENTED FOR REVIEW**

The Bressler Plaintiffs' Opening Brief identifies four issues raised on this appeal: whether the district court erred (1) by refusing to recognize an express trust or impose a constructive trust on the property of AFHR for the benefit of plaintiffs as "non-seceding" members of the International Order; (2) by declining to find that the defendant AFHR directors breached fiduciary duties owed to the plaintiffs; (3) by entering judgment for nominal damages against appellants Bressler and Voirol on the defendants' counterclaim for civil conspiracy without proof of actual damage as required by Colorado law; and (4) by dismissing the claims of appellants' new corporation, the "Order of International Co-Freemasonry Le Droit Humain, American Federation," for lack of standing.  Defendants-Appellees generally concur as to the substance of the issues raised, but dispute the Bressler Plaintiffs' characterizations of various factual matters—characterizations that form the core of the actual controversy in this action.

Colorado law governs in this diversity case, including the provisions of the former Colorado Nonprofit Corporation Act, Colo. Rev. Stat. §§ 7-20-101 *et seq.* (1973)

(repealed 1998), as well as authoritative precedent from the Colorado state courts. *See Adams-Arapahoe School District No. 28-J v. GAF Corp.*, 959 F.2d 868, 870-71 (10th Cir. 1992).

**STANDARD OF REVIEW**

The Bressler Plaintiffs do not contest the district court's findings of fact. Instead, plaintiffs challenge the district court's legal conclusions, its application of law to the facts as found—conclusions which we review *de novo*. *See, e.g., Naimie v. Cytozyme Laboratories, Inc.*, 174 F.3d 1104, 1111 (10th Cir. 1999). We likewise review *de novo* findings of "ultimate fact derived from applying legal principles to subsidiary facts." *First Nat'l Bank v. Comm'r*, 921 F.2d 1081, 1086 (10th Cir. 1990). "'On appeal, we view the evidence in the light most favorable to the district court ruling and must uphold any finding that is permissible in light of the evidence.'" *Manning v. United States*, 146 F.3d 808, 812-13 (10th Cir. 1998) (quoting *Exxon Corp. v. Gann*, 21 F.3d 1002, 1005 (10th Cir. 1994)).

**WHETHER AFHR PROPERTY IS HELD IN TRUST FOR PLAINTIFFS**

The district court adopted the parties' assumption that AFHR "is the owner of certain real and personal property valued at approximately $1,000,000," such as its headquarters property in Larkspur, Colorado. (FC&O, App. vol. II, at 387 n.1.) Nothing in the briefs or record excerpts submitted to this court disputes that assumption.

Instead, the Bressler Plaintiffs assert that AFHR holds the property it owns in an

express trust for the benefit of those members who remain loyal to the International Order. In the alternative, the Bressler Plaintiffs argue that the district court should have imposed a constructive trust upon AFHR's corporate assets in favor of those members who remain loyal to the International Order because of the defendants' inequitable conduct in "seceding" from the International Order in breach of their fiduciary duties to those members still loyal, and in breach of their contractual obligations to the International Order.

The Bressler Plaintiffs' "first" issue on appeal thus raises at least two separate issues, and we will address each in turn.

**The Existence of an Express Trust**

*The Parties' Theories*

The centerpiece of the Bressler Plaintiffs' theory of this case at trial and on this appeal is a "black-letter" rule of the law governing beneficial associations:

> When a person ceases to be a member of a voluntary beneficial association, his interest in its funds and property likewise ceases. This rule applies even where a number of members secede in a body, and although they constitute a majority and organize a new association. In such case, the remaining members, and only they, are entitled to the entire funds and property of the association, so long as they continue to keep it alive and to adhere to its purposes. . . .

10 C.J.S. *Beneficial Associations* § 48 (1995) (footnotes omitted). At the district court, plaintiffs urged that the defendants' actions in refusing to amend AFHR's By-Laws as demanded by the Supreme Council and declaring their intention to operate apart from the

International Order were the actions of disloyal members seceding from the organization and that they thereby lost any interest in or control over the organization's property, individually or as directors of AFHR. (*See* FC&O at 13, App. vol. II, at 399; Opening Brief at 26; Reply Brief at 8.) Ms. Bressler and others, as former AFHR members still "loyal" to the International Order, insist that the above-quoted rule applies to the events of 1993-94 and that AFHR's property must therefore be held in trust for their benefit.[22]

They also point to *Bishop and Diocese of Colorado v. Mote*, 716 P.2d 85 (Colo.), *cert. denied*, 479 U.S. 826 (1986), as authority for the proposition that Colorado law recognizes an "express trust created by implication in fact" where the property of a local church has been "dedicated to the use and control" of a larger church organization as evidenced by a long-term pattern of local subservience to the larger body. (Reply Brief at

---

[22]Several of the cases cited by the Bressler Plaintiffs invoke this general rule that members who have withdrawn from an association have no continuing interest in its property. *See DeBruyn v. Golden Age Club of Cheyenne*, 399 P.2d 390, 392-93 (Wyo. 1965); *Progressive Union of Tex. v. Independent Union of Colored Laborers of Tex., Lodge No. 1*, 264 S.W.2d 765 (Tex.Civ.App. 1954); *Most Worshipful Sons of Light Grand Lodge v. Sons of Light Lodge No. 9*, 118 Cal.App.2d 78, 257 P.2d 464, 468 (1953); *Stringfellow v. Loyal Tabernacle No. 48*, 291 S.W. 1115, 1116 (Tex.Civ.App. 1927); *Henry v. Cox*, 25 Ohio App. 487, 491, 159 N.E. 101, 102 (1927); *Loyal Orange Institution v. Morrison*, 269 Pa. 564, 112 A. 862 (1921). That rule appears to be related to the common-law rule that a transfer of the property of an unincorporated association requires the unanimous consent of the members. *See Loveland Camp No. 83, W.O.W. v. Woodmen Bldg. & Benev. Ass'n*, 116 P.2d 195, 197 (Colo. 1941) ("Nor is there disagreement that at common law such organizations could convey their property only by deed signed by all of the individual members of the organization"); *Schriner v. Sachs*, 253 Pa. 611, 98 A. 724 (1916); *Hamilton v. White*, 42 Ariz. 170, 22 P.2d 1089 (1933); *McFadden v. Murphy*, 149 Mass. 341, 21 N.E. 868, 869-70 (1889). Absent unanimous consent, even a withdrawing majority cannot take the association's property with them when they leave: "The assets of a fraternal association are the property of *all* the members, not of any number less than all of them. They can only be transferred to another lodge by consent of *all* the members." *Most Worshipful Sons of Light Grand Lodge*, 257 P.2d at 468 (emphasis in original).

6-7 (citing *Mote*, 716 P.2d at 103 n.14, 104-08).) The Bressler Plaintiffs argue that "the district court erred in projecting that the Colorado courts would not recognize the imposition of the express trust sought here by the plaintiffs." (*Id.* at 8.)

Defendants-appellees AFHR and its directors, Rosario Menocal; Yvonne Haley; Maximo Cumsille; Norbert Orszula; John Schwarz (the "AFHR Directors") respond that the re-incorporation of AFHR in Colorado in 1975 yielded an autonomous corporate entity governed by its own articles, by-laws and the applicable laws of the State of Colorado, independent of the control of the International Order. "Fraternal matters which were ritualistic in nature" were thereafter governed by an unincorporated federation of lodges under the rules and regulations adopted by the federation's North American Consistory and pursuant to the International Constitution. (Appellees' Answer Brief at 15.) In effect, according to the AFHR Directors, the International Order ratified AFHR's independence in 1979 by approving AFHR's Colorado re-incorporation—at least twenty years before the Calla Haack controversy arose, and long before AFHR's January 20, 1994 meeting with the Grand Master in Paris. They insist that the International Order in 1994 was in no position to wrest control of AFHR from AFHR's own Grand Council of Administration, or to seize control of AFHR's corporate assets through the efforts of Ms. Bressler, Mr. Voirol, or anyone else.

The district court concluded that

[i]n this instance, the Corporation was formed with the declared intent of separating its legal or secular matters from its ritual or ceremonial aspects. .

-27-

> . .  If in fact the Colorado Corporation changed the legal relationship between the American federation and the International Order, that change was approved by the Order in 1979 . . . .  An independent legal entity was created, and plaintiffs cannot now transmogrify a Colorado corporation into (or back into) an obedient association in disregard of law, its articles and bylaws.

(FC&O at 19-20, App. vol. II, at 405-06.)

In their Reply Brief, the Bressler Plaintiffs submit that the issue on appeal is "not whether secession occurred in 1975," but "whether the American Branch of the Order created a corporate structure in 1975 that stripped the fraternity's loyal members of their legal interest in the contributions collected, and property obtained, over its ninety-year history." (Reply Br. at 2.)  They dispute the district court's conclusion that subservience to the International Order as demanded by its Supreme Council in 1993 was inimical to AFHR's corporate governance or in any way contrary to Colorado law.

### *The International Order and AFHR Corporate Documents*

The Bressler Plaintiffs' assertion of an express trust in AFHR's assets would prove far easier to accept had the International Order and AFHR's incorporators availed themselves of the simple expedient of including explicit language in the International Constitution and in AFHR's Charter, Articles of Re-incorporation, or By-Laws, *e.g.*, that "the property of the Federation is held in trust for the Order of International Co-Masonry Le Droit Humain,"—if that indeed was the parties' intention at the time that AFHR was brought into corporate existence.

Express language was at issue in *Die Gross-loge Des Ordens Der*

-28-

*Hermanns-Soehne im Staate Colorado v. Wolfer*, 42 Colo. 393, 94 P. 329 (1908), a suit

by a Grand Lodge against former officers of an incorporated local lodge of the Sons of

Hermann who had dissolved the lodge and distributed the cash funds of the lodge among

themselves and other members, notwithstanding express language in their Grand Lodge's

constitution providing that "[s]hould a lodge disband itself, the then (last) officers of the

lodge shall deliver up all the property of the lodge to the Grand Lodge." Even by the

local lodge's Colorado certificate of incorporation

> it was and is provided that defendant lodge should be a subordinate lodge of
> plaintiff society and subject to [the Grand Lodge]'s constitution, laws, and
> regulations and its own constitution as aforesaid, and the contracts and
> agreements thereunder arising, and defendant lodge thereupon assumed and
> agreed to be bound by the provisions thereof, and became and is the
> successor of said unincorporated lodge, and the said defendant lodge and
> the members thereof are, and ever since such incorporation have been,
> firmly bound by the contracts and agreements, constitutions, laws, and
> regulations herein mentioned.

94 P. at 330. The Colorado Supreme Court decided *Wolfer* in one sentence: "Our

conclusion is that the complaint states a cause of action against the defendants, and that,

under the facts averred therein, they are jointly and severally liable to the [Grand Lodge]

for the funds they misappropriated." *Id.* at 331.

Many of the other cases cited by the Bressler Plaintiffs were also decided on

explicit language found in organizational documents, be it language creating an express

trust, *see Grand Court of Washington, Foresters of America v. Hodel*, 74 Wash. 314, 133

P. 438, 438 (1913) (trust enforced where general laws of order provide that "[a]ll

-29-

property and funds of a court and their increment, shall be held exclusively as a trust fund for carrying on the fraternal and beneficial features of the order"); *National Circle, Daughters of Isabella v. Hines*, 92 A. 401 (Conn. 1914); a reverter clause, *see Phillips v. Widow's Son Lodge No. 54, A. F. & A. M.*, 152 Va. 526, 147 S.E. 193, 194 (Va. 1929) (action of members withdrawing from unincorporated lodge in transferring funds to themselves and to new lodge held without warrant of law, where Constitution of Grand Lodge provided that, when lodge ceased to function, all its property vested in Grand Lodge in trust); *Grand Castle, Knights of Golden Eagle of Pennsylvania, v. Taylor*, 278 Pa. 9, 122 A. 210 (1923) (reverter clause enforced under state statute); *Koerner Lodge, No. 6, K. of P. v. Grand Lodge K. of P. of Indiana*, 146 Ind. 639, 45 N.E. 1103 (1897)[23]; a combination of trust and reversion provisions, *see District Grand Lodge No. 25 Grand United Order of Odd Fellows v. Jones*, 138 Tex. 537, 160 S.W.2d 915, 920-22 (Tex. Com. App. 1942) (detailed provisions of constitution and by-laws of unincorporated fraternal benefit society providing that all property acquired by subordinate lodges should

---

[23]In *Koerner*,

> Among the provisions of the constitution and laws of the grand lodge for the government and control of subordinate lodges are the following: "When a lodge is suspended or dissolved, it shall be the duty of its last chancellor commander, and all other officers, to deliver up its dispensation or charter, books, jewels, funds, emblems, regalia, and all other property and effects, together with a list of all members of said lodge in good standing at the time of its dissolution, to the grand chancellor, or his deputy;" . . . .

45 N.E. at 1105. The remaining loyal members of local lodge were held to be entitled to retain lodge property as against grand lodge because local lodge continued to exist notwithstanding attempted secession by other members. *Id.* at 1108.

be held in trust for society and that when any subordinate lodge became defunct, all property held in trust by it should be taken over by society, reinforced by statutory reverter, held enforceable); *Hermione Lodge No. 16, Knights of Pythias, of Decatur v. Grand Lodge, Knights of Pythias of Alabama*, 248 Ala. 473, 476, 480, 28 So.2d 166, 169, 171, 168 A.L.R. 948 (1946)[24]; *Knights of Pythias of New Jersey v. German Lodge, No.50*, 38 A. 341 (N.J.Ch. 1897);[25] or a forfeiture provision, *see Grand Aerie, Fraternal Order of Eagles v. National Bank of Washington, Kent Branch*, 13 Wash. 2d 131, 124 P.2d 203

---

[24]In *Hermione Lodge*, it was provided in the statutes of the Grand Lodge that the receipts from fees and dues, and the implements thereof constituted a Trust Fund for the carrying out of the fraternal and benevolent features of the Order; that the funds of the lodge shall not be subject to partition among the members thereof, and that in case the lodge shall for any cause cease to exist, the lodge funds shall revert to the Grand Lodge. "We think it is clear enough the Grand Lodge was within its rights in asserting its ownership of all the effects of the complainant subordinate Hermione Lodge No. 16" following the dissolution of the local lodge. 28 So. 2d at 171.

[25]By chapter 16, § 328, of the supreme statutes of the order, the funds of a lodge are devoted to a particular purpose, as follows:

> "The receipts from fees and dues and the increments thereof shall constitute a trust fund for carrying out the fraternal and beneficial features of the order, and shall not be expended for any other than those purposes and the payment of the necessary expenses of the lodge, as those purposes and expenses may be determined legislatively or judicially by the grand lodge having jurisdiction, which grand lodge shall also determine the vote that shall be necessary to make an expenditure from the fund, and the manner in which it may be invested, if at all. This fund shall not be subject to partition among the members of a lodge, and in case a lodge shall, from any cause, cease to exist, said fund shall revert to the grand lodge within whose domain the lodge is located."

> In this case the terms of the trust are found in the constitutions of the supreme, grand, and subordinate lodges, and the laws of the former and by-laws of the latter. The funds, being impressed with such a trust, cannot lawfully be diverted therefrom . . . .

38 A. at 344, 345 (citations omitted)

(1942). In *Grand Aerie*, the court explained that

> [t]he constitution and laws of the Grand Lodge provide that, when a subordinate lodge surrenders its charter or when such charter is revoked, all the property, both real and personal, belonging to such lodge, and all of its money, books, papers, and paraphernalia, and other possessions of value, shall be transferred to the secretary of the Grand Lodge who shall become the custodian of such surrendered property and effects,

and that "even though the property be held in the name of the corporation of the subordinate lodge, upon suspension or revocation the property becomes that of the Grand Lodge, *if the constitution so provides*, as it does in the case before us." 124 P.2d at 204, 205 (emphasis added).

Here, in contrast, the International Order and AFHR's incorporators did *not* adopt any such language. There is *no* language of express trust. There is *no* reversion or forfeiture clause providing that if AFHR's Charter is revoked by the Supreme Council, "the officers of the Federation shall deliver up all the property of the Federation to the Supreme Council for the use and benefit of members of the Order," or the like. Indeed, as Ms. Bressler and others concede, "the articles and by-laws are silent regarding secession" (Reply Brief at 8), as they are concerning the existence of an express trust, or the effect of revocation of a charter.[26] The International Constitution likewise remains

---

[26]AFHR's Rules and Regulations *do* contain a provision similar to that addressed in *Wolfer*: "If dissolution [of a Lodge] be pronounced, the charter, constitutions, seal, books, registers of degrees, archives and moneys shall immediately become property of the A.F.H.R." (AFHR Rules and Regulations, Art. 16, Addendum, vol. I, tab 2, at 39.) Appellants' assertion at page 8 of their Reply Brief that "after secession or dissolution of a local lodge, the property of the lodge shall remain with 'the Brethern who desire to maintain the lodge" simply misstates the Rule; they

(continued...)

silent as to the International Order's interest, if any, in the property of its affiliated

federations and lodges.[27]

The one clear, definite and unambiguous expression concerning the control of

AFHR's property is found in Article VIII of the AFHR By-Laws: "The Grand Council of

Administration shall have exclusive control of all funds and properties of the Federation."

(*Id.* Art. VIII, Sec. 1, Blue Book at 23, Addendum vol. I, tab 2, at 33.) Remarkably, the

Bressler Plaintiffs make *no* mention of this provision in either of their briefs, offering no

explanation as to how to construe "exclusive control" to mean anything other that what it

plainly says.

### *The District Court's Ruling*

Following five days of trial testimony, the district court found AFHR to be

independent of the International Order as far as its property is concerned, and declined to

---

[26](...continued)
quote Article *14*, which applies in instances where dissolution "cannot be pronounced" and the local lodge continues to function. (*Id.* Arts. 13, 14.)

Moreover, according to AFHR's 1975 Articles, "This corporation does not contemplate gain to its Members, and upon dissolution after all obligations have been provided for, shall be transferred only to a like group or organization being non profit in nature." (AFHR Articles of Re-Incorporation, TENTH, Addendum, vol. I, tab 2, at 29.) Even if AFHR is dissolved, its assets do not automatically revert to the International Order.

[27]The 1910 Charter authorized Louis Goaziou and other named persons "to form the American Federation of Human Rights, a legal corporation, to administer and direct the Financial affairs of Co-Masonry in the United States under the authority of an accredited Representative of the Supreme Council,"but the "Financial Arrangements" referred to in the International Constitution are narrow and specific: "Every . . . Federation collects from its members the annual dues demanded by the Supreme Council for every member of the Order of International Co-Freemasonry, < Le Droit Humain >." (International Const., Art. 84 [Ch. XVII, Art. 2], Addendum, vol. I, tab 1, at 9. *See also id.* Art. 80 [Ch. XV, Art. 5].)

find the existence of an express trust in AFHR's property in favor of the International Order or the individual plaintiffs: "In the end, to grant plaintiffs their requested relief by enforcing Masonic hierarchical control, I must disregard the reality of the corporate organization, its articles, bylaws, and, ultimately, Colorado law. . . ." (FC&O at 19, App. vol. II, at 405.) "The reality" as found by the district court "is that the organization of the Colorado corporation did not . . . create an entity that was ultimately subject to the control of the International Order. . . . Since all plaintiffs' claims proceed from the wrong premise that the Masonic structure controls, plaintiffs' claims should be denied." (*Id.* at 19, 20, App. vol. II, at 405, 406.)

Recalling the acknowledged fact that AFHR has legal ownership of its own property—the *res* of the purported express trust—the district court found nothing in this record that diminished the exclusive control over AFHR's property vested in AFHR's Grand Council of Administration by its own By-Laws.

The Bressler Plaintiffs argue that the district court erred because the 1975 re-incorporation of AFHR did not alter the "general rule" that "a subordinate member group may secede from a general order but may not also take the property acquired in the name of the general order," and they insist that "this rule applies with equal force when the seceding subordinate group is incorporated." (Opening Brief at 28 (footnote and citations omitted).)

Yet this "general rule" that "seceding members may not take the organization's

-34-

property along with them" aids the appellants in this case *only if the property in question is held to be property of the International Order*, or at least property over which the International Order exercises effective control. *See, e.g.*, *Merrill Lodge v. Ellsworth*, 78 Cal. 166, 20 P. 399 (1889) (property dispute resolved in favor of incorporated local lodge where state lodge had failed to make clear its entitlement to local lodge property in the governing organizational documents).[28] The *Mote* case offers specific guidance bearing upon this question.

### Mote *and the Existence of an Express Trust*

In *Bishop and Diocese of Colorado v. Mote*, 716 P.2d 85 (Colo. 1986), *cert. denied*, 479 U.S. 826 (1986), the Colorado Supreme Court examined various analytical approaches and adopted what it termed the "neutral principles" approach "as the law to be applied by Colorado courts when resolving disputes over the ownership and control of church property in this state." 716 P.2d at 96 (footnote omitted). *Mote* outlined the analytical method to be applied as a matter of Colorado law:

> We . . . consider first, without the application of any presumption, whether the instruments of conveyance, church documents, and other relevant evidence establish that the general church has rights of ownership or control over the disputed church property by reason of a trust, a reverter clause, or some other basis. If, after applying neutral principles of law, such rights of ownership or control are determined to be vested in the general church, there will be no need to assess how property of the local

---

[28]Application of this "general rule" is further complicated by the fact that the Bressler Plaintiffs themselves withdrew from membership in AFHR and formed their own corporate entity that became affiliated with the International Order. *See* "The Bressler Plaintiffs' Withdrawal from AFHR," *infra.*

-35-

church is controlled.  If, on the other hand, such an analysis results in a determination that ownership or control of the disputed property is vested in the local church, it then may be necessary to determine how control over that property is to be exercised.  This is so because, as the United States Supreme Court recognized in *Jones v. Wolf*, determination of control of the local church in cases involving a dispute between contending groups within that church may be necessary to resolve internal differences concerning the use and disposition of the property of the local church.

*Id.* at 99-100 (footnote omitted).  *Mote* "decline[d] to adopt a presumptive rule of majority representation, or any other artificial presumption or rule, that must be applied in every case in which determination of control over property of a local church becomes necessary."  *Id.* at 100.  Instead, *Mote* looked for guidance to "well established principles of statutory and common law traditionally applied to determine who has legal control over any particular corporation or voluntary association and how freely or extensively that control can be exercised."  *Id.*

Applying its analysis to the facts then before it, the *Mote* court held in favor of the national church in a dispute over ownership and control of the property of a local parish, a majority of whose members had voted to secede from the national church over doctrinal differences.  There was "no doubt that legal title to the disputed real property is held by St. Mary's Church, the nonprofit corporation created by the membership in 1934."  *Id.* at 104.  Nevertheless, the *Mote* court concluded that "an intent on the part of the local church corporation to dedicate its property irrevocably to the purposes of" the national church body was "expressed unambiguously in the combination of the 1955 articles of incorporation, the local church bylaws, and the canons of the general church, to which the

local church acceded at the time this dispute arose in 1976." *Id.*

Here, the Bressler Plaintiffs contend that the district court erred "in not recognizing the same kind of express or implied trust on the organization's property as that recognized by the Colorado Supreme Court . . . in *Mote* . . . ." (Opening Brief at 35.)[29]

The district court did not make detailed findings of fact concerning the utter silence of both AFHR's organic documents and the International Order's Constitution concerning the property of AFHR or its lodges *in relation to the International Order*. Absent "a trust, a reverter clause, or some other basis" that "establish[es] that the general [Order] has rights of ownership or control" over AFHR's property, *Mote*, 716 P.2d at 99, there was very little to find. As quoted above, Article VIII, Section 1 of the AFHR By-Laws speaks in clear, concise, explicit, unequivocal and unambiguous language: "The Grand Council of Administration shall have exclusive control of all funds and properties

---

[29]     The *Mote* analysis proves to be expansive in its scope:

> Colorado recognizes that the intent to create a trust can be inferred from the nature of property transactions, the circumstances surrounding the holding of and transfer of property, the particular documents or language employed, and the conduct of the parties. . . . While such an inference is not to come easily--"[c]lear, explicit, definite, unequivocal and unambiguous language or conduct" establishing the intent to create a trust is required, . . . no *particular* language must be used to create a trust or to manifest the necessary intention to create a trust.

*Mote*, 716 P.2d at 100-01 (citations omitted). Indeed, "it is not possible for us to delineate exactly the scope of the inquiry that must be applied in every case of this type . . . ." *Id.* at 100.

The *Mote* inquiry is fact-intensive and context-sensitive, and like so many issues that come to court, the outcome is largely fact-driven.

of the Federation." (*Id.* Art. VIII, Sec. 1, Blue Book at 23, Addendum vol. I, tab 2, at 33.)

Other provisions, such as Article III, Section 1 of AFHR's By-Laws, which vests "[a]dministrative duties and financial responsibilities" in AFHR's own Grand Council of Administration, or Article 45 of the International Constitution, under which the "Supreme Council guarantees to Lodges, Jurisdictions and Federations a liberal form of government and *absolute freedom in the transaction of their internal affairs*, provided they do not act in any way contrary to the International Constitution and to the principles of the Order,"[30] seem wholly consistent with Article VIII, Section 1, and offer little footing for the existence of an express trust, even by implication. *See Mote*, 716 P.2d at 100 ("such an inference is not to come easily–'[c]lear, explicit, definite, unequivocal and unambiguous language or conduct' establishing the intent to create a trust is required" (quoting *Morgan v. Wright*, 156 Colo. 411, 415, 399 P.2d 788, 790-91 (1965))). Applying neutral principles of law to these provisions, they do not establish that the International Order "has rights of ownership or control over the disputed [AFHR] property by reason of a trust . . . ." *Id.* To the contrary, they show that "ownership or control of the disputed property is vested in [AFHR]." *Id.*

If ownership or control of the disputed property is vested in AFHR by its organic documents,

> The natural course of the inquiry then is to determine whether the plaintiffs have met their burden of presenting other evidence to establish

---

[30] (Addendum, vol. I, tab 1, at 14 (emphasis added).)

that effective control over these properties is not reposed in the legal title holder, but rather that the local church property has been dedicated to the use and control of the general church.

*Id.* at 104.

In *Mote*, the court examined the local parish's articles of incorporation and by-laws, the canons of the general church and the Diocese to which the local church had acceded, the Colorado statutes, as well as the "conduct of the relevant officials of the local and general church." *Id.* at 104. It found that the parish's articles stated among it purposes: "to administer the temporalities of the Protestant Episcopal Church" and "to acquire, hold, use and enjoy all of the property, now held for the members of said church"; that the parish acceded to canons of the general church and Diocese that imposed restrictions on encumbrance or alienation of parish property and on the removal or disposition of any church or chapel without the written consent of the Diocese; that upon dissolution of the parish, "the title to all of its property, both real and personal, shall vest automatically and forthwith" in the Diocese; that parish buildings, chapels and houses of worship "may be opened for all Services, Rites, Ceremonies or other purposes authorized . . . by The Church in the United States . . . ;" and that parish property "is not intended by the general church to leave the diocese." *Id.* at 104-07.

> We conclude that an intent on the part of the local church corporation to dedicate its property irrevocably to the purposes of [the general church] was expressed unambiguously in the combination of the 1955 articles of incorporation, the local church bylaws, and the canons of the general church, to which the local church acceded in its articles at the time this dispute arose in 1976. This construction is reinforced by the conduct of the

relevant officials of the local and general church.

*Id.* at 104.

What little evidence we have gleaned from this record concerning the exercise of control over AFHR's property, particularly its headquarters building and real estate holdings, reflects that AFHR controls, maintains and administers AFHR's real and personal property pursuant to its clear and unequivocal authority under Article VIII, Section 1, without significant direction or input from the International Order. None of AFHR's organic documents restrict the encumbrance, alienation, disposition or use of AFHR property according to the dictates of the International Order. There is no reversion from AFHR to the International Order in the event of dissolution.

Much of the Bressler Plaintiffs' evidence at trial concerned events in 1992-1994 affecting AFHR's corporate structure, as well as numerous meetings, communications and correspondence involving the parties and other interested persons, and the various oaths taken by the defendants and others affirming loyalty and obedience to the International Order, its Constitution, its Supreme Council, and its principles. The Bressler Plaintiffs did their best to paint the defendants as disloyal "secessionists," but they offered little or no evidence to show that consistent with *Mote*, "effective control over these properties is not reposed in the legal title holder, but rather that [AFHR's] property has been dedicated to the use and control of" the International Order. *Id.*[31]

---

[31]Or put another way, plaintiffs did not show that AFHR's corporate property was obtained "for

(continued...)

The Bressler Plaintiffs had submitted a proposed finding of fact bearing upon this

question:

> 47. The facts of the history of the intertwined relationship of the AFHR and the Order, as evidenced by the testimony and many of the exhibits of this case, also demonstrate an intent that the property held and administered by the AFHR would be held for the loyal members of the Order in the United States and for the uses and purposes of the AFHR as an integral national branch of International Co-Masonry.

("[Plaintiffs' Recommended] Findings of Fact, Conclusions of Law and Judgment, dated

April 7, 1997, at 20 ¶ 47, App. vol. I, at 343.)[32] The district court did not adopt this

finding, or anything similar to it.

The Bressler Plaintiffs do not challenge the district court's rejection of this

proposed finding, just as they have not challenged any of the district court's findings of

fact. Instead, they point to the law governing church property disputes as a useful

analogy[33] and argue that if that law is extended to apply to the facts in this case, then the

---

[31](...continued)
the uses of the order as a whole," in contrast to its use by AFHR or its constituent lodges. 36 Am.Jur.2d *Fraternal Orders* § 33, at 685 (2001).

[32]Though originally styled as a proposed "conclusion of law," Paragraph 47 quoted above was the Bressler Plaintiffs' only proposed finding as to what the evidence showed concerning the manner in which AFHR's property is held, in trust or otherwise.

[33]Freemasonry is not a religion and neither the International Order nor AFHR is a "church" within the commonly understood meaning of that term. Fraternal societies typically are understood to be eleemosynary organizations designed to assist members and to promote moral, intellectual and social benefits. *See, e.g.*, *Ware Lodge No. 435, A.F. & A.M. v. Harper*, 182 So. 59, 67 (Ala. 1938) (in several states "it is considered that fraternal associations, such as Masons and Odd Fellows, are classed as charitable or benevolent institutions on account of their philanthropies"; in the three charters granted to the "Most Worshipful Grand Lodge of Ancient

(continued...)

district court erred in concluding that no express trust exists. (Opening Brief at 35.)

In denying the Bressler Plaintiffs' claim of express trust, however, the district court correctly concluded that the plaintiffs had *not* met their burden of presenting other evidence to establish that effective control over AFHR's properties is not reposed in AFHR pursuant to Article VIII, Section 1 of the By-Laws and as the legal title holder, but rather that the corporation's property has been dedicated to the use and control of the International Order.[34]

This is not to say that Co-Masonry has no genuine hierarchy.

The Bressler Plaintiffs point to a series of oaths taken by members calling for fidelity and obedience to the International Constitution, as well as provisions of the International Constitution and AFHR's Rules and Regulations establishing a hierarchical structure headed by the Supreme Council of the International Order. Yet these oaths and constitutional provisions operate primarily to preserve the integrity of Masonic ritual, tradition and symbolism, and devote far less attention to more mundane matters such as property management. "To the Supreme Council alone is entrusted the preservation of the principles of the Order . . . ." (International Constitution, Art.17 [Ch. III, Art. 3],

---

[33](...continued)
Free Masons of Alabama and its Masonic Jurisdiction" the order was "recognized and classified as a charitable or benevolent institution").

[34]On appeal, the plaintiffs-appellants have not attacked the district court's findings of fact; nor have they identified any evidence received by the district court that demonstrates that "exclusive control" in Article VIII, Section 1 of the AFHR By-Laws means anything other than *exclusive control*.

Addendum, vol. I, tab 1, at 3.)  The "principles and methods of work adopted by the Order" include "the Scottish Grand Constitutions of 1786 E.V.," which establish the Masonic system of individual advancement through 33° now known as the "Scottish Rite." (*Id.* Art. 6 [Ch. I Art. 5], at 2.)  The "special duties and prerogatives of the Supreme Council are" first, "[t]o establish Lodges of all degrees" and then "to control the principles enunciated and the rituals practiced by such Lodges . . . ." (*Id.* Art. 18 [Ch. IV, Art. 1].)  The Supreme Council "approves . . . rituals of all degrees and takes a decision on any amendments proposed." (*Id.* Art. 77 [Ch. XV, Art. 2], at 9.)  Indeed, "No modification may be introduced into rituals without the approval of the Supreme Council." (*Id.* Art. 79 [Ch. XV, Art. 4].)

As explained above, "[i]n practice, the Grand Lodges preserve this body of [Masonic] symbolism and protect it from change," MacNulty, *supra*, at 6, and in this regard, the Supreme Council of the International Order "perform[s] a role as the custodian of those symbols" that does not differ from that of other Masonic Grand Lodges and Supreme Councils. *Id.*

> The International Co-Masonic Order, heir to the ancient traditions whose wise principles, moral force and discipline it has maintained, has conserved the rules of the past used by the Masonic Order, also the signs, grips, sacred words and passwords of the Ancient and Accepted Scottish Rite, employed as a means of recognition by a large number of the Freemasons scattered throughout the world.

("International Co-Masonry," in Blue Book at 3, Addendum vol. I, tab 2, at 23.)

AFHR's organic documents delineate a clear division between the authority of

AFHR's Grand Council of Administration over administrative and financial matters and the authority of the Consistory, the Representative, and the International Order's Supreme Council over matters of Masonic tradition, laws, and most importantly, matters of ritual. This is perhaps most clearly illustrated by the procedure prescribed by AFHR's Rules and Regulations for amendments to the AFHR Constitution:[35]

> ART. 57. If a member wishes to propose any amendments or additions to the General Constitution or to the Financial Rules of the Federation, he shall first present them for consideration at a regular meeting of his Lodge.
>
> Such requests, discussed and voted upon in open Lodge, shall be sent for examination and further action to the President of the Federation, if they have reference to finance, and to the Representative of the Supreme Council if they have reference to Constitution, rituals, et cetera. If the proposed changes have reference to finance or administration, they shall be submitted by the President to the Grand Council of Administration. If they have reference to Masonic traditions and laws, they shall be submitted by the Representative to the Consistory at its next annual meeting. If they have reference to rituals, they shall be submitted by the Representative to the Supreme Council.

(Rules and Regulations, Art. 57, Blue Book at 64, Addendum vol. I, tab 2, at 54.)

> There can be only one General Consistory within the Jurisdiction of

---

[35]In contrast to the International Constitution, there is no single document clearly denominated as the AFHR "Constitution" or "General Constitution." Section I of the AFHR Blue Book, entitled "Constitution and Incorporation Data," includes the text of AFHR's 1910 "Constitutive Charter," its 1909 Certificate, and its1975 Articles of Re-incorporation. Ms. Bressler testified at trial that "[t]he constitution includes everything," AFHR's Charter, Articles, By-Laws, Rules and Regulations—even the preface materials on International Co-Masonry found in the opening pages of the Blue Book. (Transcript of Trial, dated April 16, 1997, at 586:8, 10-16, App. vol. III, at 1055:8, 10-16.) The Blue Book was "[a]dopted by the North American Consistory July 19, 1919"and approved by the Supreme Council on "27 Mai 1979 E∴V∴." (Blue Book at [ii], Addendum vol. I, tab 2, at 21.)

the American Federation, and it shall be the governing body in all matters pertaining to Masonic traditions and laws, and to changes in any articles of the General Constitution which have no reference to the administrative and financial business of the Federation.

(Rules and Regulations, Art. 97, Blue Book at 82, Addendum vol. I, tab 2, at 126.)[36]

The district court found that AFHR "was formed with the declared intent of separating its legal or secular matters from its ritual or ceremonial aspects," and concluded that as to matters of corporate governance, the Bressler Plaintiffs' claims "proceed from the wrong premise that the Masonic structure controls . . . ." (FC&O at 19, App. vol. II, at 405, 406 (citing Exh. F, Minutes of First Meeting, dated August 10, 1975, Addendum vol. II, tab 70).[37]) Recognizing, as did the district court, that AFHR's "articles and bylaws form the contract of membership," (*id.* at 16, App. vol. II, at 402),

---

[36]Indeed, Mr. Voirol testified that it was the North American Consistory that in 1992 adopted the preamble to AFHR's Rules and Regulations stating that "[t]he American Federation "Le Droit Humain" reaffirms its loyalty and allegiance to the Order of International Co-Freemasonry "le Droit Humain", Zenith of Paris. . . ."—a change to the text of the Rules that could have "no reference to the administrative and financial business of the Federation" because of Article 97's limit on the power of the Consistory to act outside of matters of Masonic laws and traditions.

[37] In fact, AFHR's incorporators resolved in 1975 that "the ceremonial part of the Corporation be kept separate and apart from the legal aspects thereof . . . ." (Exh. F, Minutes of First Meeting, dated August 10, 1975, Addendum vol. II, tab 70, at 282.)

Arguing that the separation of ritual and corporate functions did not amount to a "secession," the Bressler Plaintiffs insist that AFHR did not "actually separate[] from the International Order" in 1975, and in fact that "the actual operation of AFHR for the next twenty years . . . powerfully demonstrates that AFHR continued as the American Branch of the International Order." (Reply Brief at 9, 10, 11.) "The fact that the consistory handled 'ritual' functions, while the grand council handled 'business' functions," the Bressler Plaintiffs submit, "is no more remarkable than the fact that many churches divide similar functions between a 'board of deacons' and a 'board of trustees.'" (*Id.* at 13 (citations omitted).)

the contract in this case contemplates that AFHR owns and exercises exclusive control over AFHR property and finances, without direct control or supervision by the International Order, and this remains so even after the Supreme Council's revocation of AFHR's Charter in early 1994.

Applying the analysis prescribed by *Mote* to this record, the district court's rejection of the Bressler Plaintiffs' claim of express trust proves to be correct.[38]

### *Mote* and "Other Principles"

*Mote* suggests that besides express trust, "other principles from the common and statutory law of property, contracts, corporations or voluntary associations might be the basis for a determination that a general church has a right, title or interest in the church property, requiring a more extensive inquiry."  716 P.2d at 101.

On this appeal, the Bressler Plaintiffs assert a theory of breach of corporate fiduciary duty as the basis for imposing a *constructive* trust on AFHR's property for the benefit of members still loyal to the International Order.  They also assert that the defendant AFHR Directors breached the contracts embodied in their individual oaths of loyalty to the International Order, warranting the same relief.

---

[38]Plaintiffs did not emphasize the *Mote* analysis in presenting their case at the time of trial, and the district court did not refer to *Mote* in making its findings.  Nevertheless, we may evaluate whether plaintiffs met their burden to prove the existence of an express trust in deciding whether the district court reached the correct legal conclusion.  *See Optyl Eyewear Fashion Int'l Corp. v. Style Cos.*, 760 F.2d 1045, 1051 (9th Cir. 1985) ("A district court's failure to make express findings does not require a remand if 'a complete understanding of the issues may be had [from the record] without the aid of separate findings.'" (quoting *Swanson v. Levy*, 509 F.2d 859, 861 (9th Cir. 1975))).

**Breach of Fiduciary Duty and Imposition of a Constructive Trust**

In their Fourth Amended Complaint, plaintiffs alleged that the defendant AFHR Directors had "violated their fiduciary duties of good faith, candor, due care, and loyalty," and that their conduct was "willful, reckless and/or in bad faith." (Fourth Amended Complaint at 14 ¶¶ 60-61, App. vol. I, at 319.) According to the plaintiffs, the defendant AFHR Directors breached their fiduciary duties to AFHR and to those members still loyal to the International Order when "they, having renounced their oaths of obligation to International Co-Masonry, nevertheless used their office and fiduciary position as directors of AFHR to purport to sever unilaterally the AFHR from the International Order"in 1994, following the membership's rejection of the 1993 by-law amendments demanded by the Supreme Council. ("[Plaintiffs' Recommended] Findings of Fact, Conclusions of Law and Judgment, dated April 7, 1997, at 21 ¶ 48, App. vol. I, at 344.) They complain that by "seceding" from the International Order, the AFHR Directors stripped AFHR's loyal members of their legal interest in the contributions collected, and property obtained, over AFHR's ninety-year history. (*Id.*)

As it did with respect to the claim of express trust, the district court denied the plaintiffs' claims of breach of fiduciary duty and constructive trust. The district court concluded that Colorado law would hold that "once organized under the law of the state, the corporate actions are determined by the law of that state and not by the supposed hierarchical power over the subordinate lodge." (FC&O at 15, App. vol. II, at 401.)

Evaluating the conduct of the defendant AFHR Directors in light of state corporate law rather than the theory of Co-Masonic hierarchy urged by the plaintiffs, the district court found no breach of fiduciary duty and no basis for imposing such a remedy.

Among other authorities, the district court relied upon *Horst v. Traudt*, 43 Colo. 445, 96 P. 259 (1908), as analogous support for this view, stating that "the Colorado Supreme Court was unequivocal that, once incorporated, a society is governed by the civil law of Colorado and not some higher authority." (FC&O at 15, App. vol. II, at 401.) Appellants seek to discredit *Horst*, arguing that *Mote* "specifically cited and distinguished the *Horst* case, (Reply Brief at 5), and "explicitly rejected" a narrower approach to resolving property disputes arising out of a disaffiliation based upon corporate laws and procedures as "'unduly restricted in scope and therefore fundamentally flawed.'" (Opening Brief at 35 (quoting *Mote*, 716 P.2d at 102).)[39]  *Horst*, after all, "did not involve property issues arising out of a disaffiliation." (Reply Brief at 5.)

Contrary to appellants' assertion, however, *Horst* continues to provide meaningful guidance in resolving church property disputes under Colorado law, even after *Mote*:

> Even though *Mote* involved a church property dispute, we noted that during the turn of the century this court had held that religious corporations, "are subject to the principles of the common law and the practice and procedure

[39]The approach that the *Mote* court found "unduly restricted in scope" at page 102 of its opinion was the Colorado Court of Appeals' reliance upon a "presumptive rule of majority representation" without making "a more traditional and general inquiry as to the locus and nature of control in the local organization." 716 P.2d at 102.  The court of appeals, *Mote* explained, "did not go further and examine the record to determine whether the secessionist majority controlled the corporation to the necessary extent to control the property." *Id.*

applicable to corporations under the general incorporation laws, so far as the same are pertinent." *Mote*, 716 P.2d at 98 (quoting *Horst v. Traudt*, 43 Colo. 445, 96 P. 259 (1908)). We recognized in *Mote* that *Horst* was not controlling precedent but we read *Horst* as general guidance and "as a persuasive statement that this court should analyze legal issues that arise out of church organizations in the same manner as we would analyze those issues if they arose out of any other corporation or voluntary association." *Mote*, 716 P.2d at 99.

*Moses v. Diocese of Colorado*, 863 P.2d 310, 320 (Colo. 1993).[40] To the extent, then, that *Mote*, *Moses*, and other Colorado cases involving church property disputes provide a helpful analogy in resolving property disputes involving fraternal organizations, then we read them in turn "as a persuasive statement that this court should analyze legal issues that arise out of [fraternal] organizations in the same manner as we would analyze those issues if they arose out of any other corporation or voluntary association." *Mote*, 716 P.2d at 99.

The legal question now presented is whether the AFHR Directors breached their fiduciary duties under the Colorado law governing non-profit corporations.

### *Fiduciary Duty and "Lack of Candor"*

The Bressler Plaintiffs asked the district court to find that "there is ample evidence supporting at least lack of candor if not bad faith on the part of defendants in connection with their secession," the alleged "lack of candor" consisting of the defendant AFHR Directors' decision to announce a severance from the International Order without first

---

[40]Apparently the appellants overlooked *Moses* in their effort to inform this court of pertinent Colorado case authority as neither the Opening Brief nor the Reply Brief cite to it.

consulting with Ms. Bressler or "any of the loyal 32nd degree members of the Consistory of AFHR," ("[Plaintiffs' Recommended] Findings of Fact, Conclusions of Law and Judgment, dated April 7, 1997, at 21-22 ¶ 50, App. vol. I, at 344-45.)  Yet the AFHR Directors' January 1994 declaration appears direct and forthright as to their own intentions, and effectively communicated those intentions to Ms. Bressler, the Consistory and the balance of AFHR's membership as soon as was practicable following the January 20 audience in Paris.  It proves difficult at best to characterize the declaration as evidencing a "lack of candor."

The AFHR Directors owed fiduciary duties of loyalty and due care to AFHR under Colorado law, and were obligated to conduct AFHR's business in conformity with its Articles and By-Laws.  Ms. Bressler and others strain to establish an additional fiduciary duty to obey the directives of the Supreme Council notwithstanding these existing duties,[41] but fail in the attempt.  As the district court explained,

> In descending order of authority, the preeminent, overarching authority over a corporation is the state statutes creating and governing that particular corporation.  Next are the articles of incorporation which must be consistent with that state law.  Next are the bylaws which, in turn, must comport not only with the statutes but also the articles of incorporation.  Finally, various policies, rules or regulations may be adopted from time to time.  These cannot contradict Colorado law, the articles of incorporation or the bylaws. .

---

[41]In the plaintiffs' proposed conclusions of law, they submit that "the individual defendants breached those fiduciary responsibilities when they, having renounced their oaths of obligation to International Co-Masonry, nevertheless used their office and fiduciary position as directors of AFHR to purport to sever unilaterally the AFHR from the International Order."  ("[Plaintiffs' Recommended] Findings of Fact, Conclusions of Law and Judgment, dated April 7, 1997, at 21 ¶ 48, App. vol. I, at 344.)

. .

Plaintiffs would stand this legal hierarchy on its head . . . .

(FC&O at 17-18, App. vol. II, at 403-04 (footnotes omitted).) *See* Colo. Rev. Stat. § 7-23-102 (1973) ("The bylaws may contain any provisions for the regulation or management of the affairs of a corporation not inconsistent with the law or the articles of incorporation.") (repealed 1998).

The matter of the 1993 Amendments was not decided by the AFHR Directors in Paris on January 20, 1994. For purposes of corporate governance, it had already been decided by the vote of the AFHR membership rejecting the proposed amendments in late 1993. Under Article XII of AFHR's By-Laws as well as provisions of the Colorado statute, the members acted well within their rights in voting down the proposal.

Resolution of the conflict proved unattainable in January 1994 given the Supreme Council's unyielding insistence that the AFHR Directors acquiesce in what amounted to an *ultra vires* act under Colorado law, that is, the surrender of corporate governance to persons outside of AFHR's board, contrary to its own By-Laws and the members' majority vote soundly rejecting that change.[42] Any acquiescence by the AFHR Directors

---

[42]Moreover, the demand may have been *ultra vires* for the International Order as well. Nothing in the International Constitution affords its Representative such sweeping authority over the internal affairs of an established national federation; if anything, it vests the Representative with the right to attend and speak at meetings and receive copies of minutes. (International Constitution, Art. 55 [Ch. XI, Art. 4], Addendum, vol. I, tab 1, at 7.) At most, the Representative "directs the administration of the Federation *in co-operation with* the organizations provided by the National Regulations." (*Id.* Art. 59 (emphasis added).) A veto is inherently non-cooperative. Nor is it obvious how the Supreme Council's stance in this matter comports with its

(continued...)

-51-

in the Supreme Council's demands in January 1994 would have had no legal effect under Colorado law. *See Woodmen of the World v. McCue*, 88 Colo. 209, 294 P. 947, 954 (1930) (amendment to constitution of fraternal benefit society not shown to have been adopted by two-thirds of votes entitled to be cast as required by society's constitution, held not legally adopted); 10 C.J.S. *Beneficial Ass'ns* § 25 (1995). Without an approving vote by the membership, the AFHR Directors simply could not accomplish what the Supreme Council demanded of them.

The Bressler Plaintiffs contend that the AFHR Directors acted beyond their authority under AFHR's By-Laws, pointing to the January 21, 1994 letter to all members detailing the intended transition from federation to Grand Lodge,[43] and board minutes of the same date purporting to amend the AFHR By-Laws concerning membership in the corporation.[44]

_____

[42](...continued)
constitutional duty "to settle in the last resort, all matters in such a way as to ensure the stability and progress of the Order." (*Id.* Art. 18 [Ch. IV, Art. 1], Addendum, vol. I, tab 1, at 3.)

[43](*See also* Letter from Rosario Menocal, dated February 13, 1994, Pltfs' Exh. 88, Addendum, vol. II, tab 55, at 177-81.)

[44]According to the Minutes,

The following change to the By-Laws was approved:

- Definition of a "Third Class Member":

An individual person who has received the 3~~thr~~rd degree in the Co-Masonic Order or in the American Federation of Human Rights and whose dues to the AFHR are currently paid up and is accepted

(continued...)

Indeed, under AFHR's existing By-Laws, the directors' January 1994 declaration, by itself, was at most an inchoate act. Actual secession would require the amendment of provisions of AFHR's Rules and Regulations by AFHR's North American Consistory to remove requirements for action by the Representative of the Supreme Council or the Supreme Council itself, such as issuing certificates of initiation to new members or diplomas to members becoming Master Masons. (Rules and Regulations, Art. 7, Addendum vol. I, tab 2, at 37-38, App. vol. I, at 100-01.) Changing the By-Laws' membership requirements would require compliance with the prescribed amendment process, including ratification by the voting members. To recast AFHR as a "Grand Lodge" with its own "Supreme Council" as the AFHR Directors had announced, amendment of AFHR's By-Laws would likewise be required.

The January 21, 1994 letter accomplished none of these things.

The AFHR Directors' January 21, 1994 "secession" was declaratory of the board's present intentions, but had no immediate operative effect upon the governance or membership of AFHR. The status of AFHR members—including Ms. Bressler and the other plaintiffs—under AFHR's Articles and By-Laws was no different after January 21, 1994 than it was before that date and could not be altered absent lawful amendment of the

---

[44](...continued)
       by the Grand Council of Administration.

("Minutes of the GCA," dated January 21,1994, Ptlfs' Exh. 84, Addendum vol. II, tab 52, at 173.)

AFHR By-Laws.  The AFHR Directors' declaratory act could not and did not divest

AFHR members—loyal or otherwise—of any legal interest in AFHR's property or funds.

The district court correctly concluded that the Bressler Plaintiffs failed to establish

their claim of breach of fiduciary duty, or prove wrongful conduct on the part of the

defendants-appellees warranting the imposition of a constructive trust on AFHR's

property and funds.

**Breach of Contract and Imposition of a Constructive Trust**

Besides breach of fiduciary duty, the Bressler Plaintiffs asserted that the defendant

AFHR Directors breached the contract with the International Order represented by their

membership and individual oaths of loyalty to the International Order, citing cases such as

*National Grange of Order of Patrons of Husbandry v. O'Sullivan Grange*, 35 Wash. App.

444, 667 P.2d 1105 (1983), and *Di Silvestro v. Sons of Italy Grand Lodge*, 129 Misc. 521,

532, 222 N.Y.S. 203, 214 (1927).[45]  They argue that "the defendants' act of disaffiliation

purported to put the control and management of the property and affairs of AFHR into the

---

[45]The Bressler Plaintiffs asked the district court to conclude that

> the oaths of loyalty and obedience entered into by individual defendants and
> repeatedly reaffirmed by them during the years of their membership in the
> International Order, taken together with the Constitution and By-Laws of the
> International Order as expressly incorporated into the Constitution of AFHR,
> constitute a contract between the individual defendants and AFHR.

("[Plaintiffs' Recommended] Findings of Fact, Conclusions of Law and Judgment, dated April 7,
1997, at 18 ¶ 42, App. vol. I, at 341.)  Notably absent from this recital are AFHR's own Articles
and By-Laws, which bear directly upon the "contract between the individual defendants and
AFHR."

hands of a Board of Directors which had expressly renounced its obligations to the Order," that secession "would establish a wholly independent and different Order from that to which the members, including defendants, had sworn obedience," and that the AFHR Directors' "breach of contract has caused . . . damage to plaintiffs by removing from the legal possession and control of the loyal members of AFHR the assets acquired in the name of AFHR over a 90-year history of affiliation with International Co-Masonry." ("[Plaintiffs' Recommended] Findings of Fact, Conclusions of Law and Judgment, dated April 7, 1997, at 19 ¶¶ 44, 45, App. vol. I, at 342.)

Generally, "The constitution and bylaws of the central governing body of a fraternal benefit society, together with the charter of the subordinate body, constitutes a contract between the subordinate and parent organizations . . . ." 36 Am.Jur.2d *Fraternal Orders* § 30, at 682 (2001) (footnote omitted).) In *O'Sullivan Grange*, the constitution, bylaws and other rules and decisions adopted by National Grange to govern the Order, were contained in the "Digest of the Patrons of Husbandry." Among other restrictions, the Digest prohibited a subordinate grange "from transferring real property, except after (1) proper notice to the membership and resolution approved by a two-thirds vote of the grange, and (2) approval of the executive committee or master of the state grange"; it required a subordinate grange "that is authorized to sell its real property to 'account for all monies received in the transaction and ... remit all but the sum of $1,000 of such proceeds to the State Grange'"; and provided that the property of a dissolved local grange

reverts to the state grange after seven years unless the local grange reorganizes within that time. *Id.* 667 P.2d at 1107-08. The members of O'Sullivan Grange, an incorporated local grange chartered by the National Grange, opted to dissolve and transfer its property to a new corporation, at the same time removing from O'Sullivan Grange's by-laws any requirement that it comply with the Digest, particularly its reverter clause. Noting that it "[i]t has long been established the constitution and bylaws of the national or governing body of a beneficial association or fraternal order are binding upon the subordinate organizations," and that it was "undisputed that their intention was to avoid reversion of O'Sullivan Grange property to the State Grange," the court concluded that the O'Sullivan Grange was bound to comply with the Digest and could not alter this by incorporating and later amending out language requiring compliance with Digest. "O'Sullivan's effort to amend its corporate bylaws by deleting the provision requiring it to comply with section 15 of the Digest could not change its contract with the Order. To the contrary, incorporation of a subordinate organization does not change its purpose or status as an extension of the supreme body. Nor does it affect the charter and oath to obey the constitution and bylaws of the Order." *Id.* at 1109. Acting unilaterally, then, the local grange "could not amend its bylaws to change its contractual obligations with the National and State Granges" concerning local grange property. *Id.* at 1111.

Other cases cited by the Bressler Plaintiffs also involved enforcement of express trust language or conveyance restrictions set forth in organizational documents. *See*

*Hermione Lodge No. 16, Knights of Pythias, of Decatur v. Grand Lodge, Knights of Pythias of Alabama*, 248 Ala. 473, 476, 28 So. 2d 166, 169, 168 A.L.R. 948 (Ala. 1946);[46] *Grand Lodge of Iowa of the Independent Order of Odd Fellows v. Osceola Lodge No. 18*, 178 N.W.2d 362, 364-66 (Iowa 1970).[47]

Here, in contrast, the International Constitution remains silent as to the property of national federations, and AFHR's By-Laws grant exclusive control over the corporation's property to its own board.[48]  Moreover, as the district court found, the Supreme Council

---

[46]For the government of the subordinate lodges it was provided in the statutes of the Grand Lodge that the receipts from fees and dues, and the implements thereof shall constitute a Trust Fund for the carrying out of the fraternal and benevolent features of the Order; that the funds of the lodge shall not be subject to partition among the members thereof, and in case the lodge shall for any cause cease to exist said funds shall revert to the Grand Lodge.  The court concluded that  "the Grand Lodge was within its rights in asserting its ownership of all the effects of the complainant subordinate Hermione Lodge No. 16" following the dissolution of the local lodge. 28 So.2d at 171.

[47]In *Osceola Lodge*, the rules of the Order permitted all lodges

> to acquire property which must be used only for dedicated purposes of the Order. These rules also preclude disposition of property by a local lodge for any purpose other than in furtherance of programs and principles of the Order.  They also provide a local lodge shall not dispose of its properties for the purpose of defeating reversionary interests held by the Grand Lodge.  In this respect, if a local lodge in the State of Iowa at any time ceases to exist, then Iowa Grand Lodge has a reversionary right to all property held by the local body.

178 N.W.2d at 364.  In 1965, the Grand Lodge sought equitable relief imposing a trust on property conveyed by the Osceola Lodge to another corporation in 1948, but the court held the action to be barred by the statute of limitations.

[48]"In the absence of statutory or contract regulation, any funds that are accumulated and maintained by subordinate lodges belong to them."  36 Am.Jur.2d *Fraternal Orders* § 33, at 684 (1991) (footnote omitted). While "the charter, constitution, and bylaws of a fraternal order . . .

(continued...)

approved the modifications to AFHR's "Réglements Généraux"—the 1975 Articles and By-Laws—in writing in 1979.  (*See* Letter to Helen Wycherley, dated May 31, 1979, Defs' Exh. G, Addendum, vol. II, tab 71, at 288.)  The 1975 Articles and By-Laws thereby became part of the existing contractual agreement between AFHR, its members, and the International Order,[49] and if that changed the relationship between AFHR and the International Order, "that change was approved by the Order in 1979" and "[a]n independent legal entity was created" that was not "ultimately subject to the control of the International Order."  (FC&O, at 19, App. vol. II, at 405.)[50]

In contrast to cases such as *O'Sullivan Grange*, AFHR's exclusive control over its own corporate property was already part of the "contract" with the International Order.

---

[48](...continued)
constitute a binding contract between the parent order and its subsidiary branches, under which control and ownership of funds or realty *may* be vested in the supreme or parent body," *id.* (emphasis added & footnote omitted), such vesting is *not* required, and has not been shown to be the case here, except as to dissolved American lodges, whose assets revert to AFHR, not to the International Order.  (*See* Rules and Regulations, Art. 16, Blue Book at 35, Addendum vol. I, tab 2, at 39.)

[49]The approved omission of the language from AFHR's Articles concerning the conducting of lodges of "Co-Masonry under the authority or jurisdiction of the Supreme Council of universal Co-Masonry with headquarters in Paris, France" likewise became the subject of bilateral agreement rather than a unilateral alteration.

[50]The AFHR Directors assert that AFHR's 1975 reincorporation effected a "separation" of "legal and business matters . . . from matters of ritual that were carried on by the Lodges through their unincorporated Federation of Lodges governed by the North American Consistory and the 'Order,'" and argue that the Co-Masonic hierarchy affects the "American Federation" as *an unincorporated association* distinct from the AFHR corporate entity, "which, as a fraternity, did handle ritual matters separate from AFHR . . . .  Vera Bressler was the Grand Commander of that separate entity (the fraternity) and with the 'North American Consistory' ritual matters were separately administered . . . ."  (Answer Brief at 6, 23.)  The district court did not explicitly adopt the appellees' "two Federation" theory and we need not address it further on this appeal.

As explained above, the declaratory "secession" by the AFHR Directors in January 1994 worked no change in the substantive rights of AFHR and by itself could not "remov[e] from the legal possession and control of the loyal members of AFHR the assets acquired in the name of AFHR over a 90-year history of affiliation with International Co-Masonry," as the Bressler Plaintiffs argue.

The AFHR Directors' declaration, by itself, also proved ineffective to disaffiliate AFHR and its members from the International Order, or to "establish a wholly independent and different Order from that to which the members, including defendants, had sworn obedience," as the Bressler Plaintiffs claim.

In *Di Silvestro v. Sons of Italy Grand Lodge*, 129 Misc. 521, 532, 222 N.Y.S. 203 (1927), a case cited by the Bressler Plaintiffs, the court concluded that as to the Sons of Italy, any attempted secession of a subordinate body or order from the national fraternal order, unless through the unanimous action of all its members, was ineffective as to *all* members:

> Each member of a district lodge became on admission a member of the parent order, as well as a member of the district and Grand Lodge. The practical effect of a severance of affiliation to the parent order would be to sever the relation of the district lodges and their members from the General Order. It deprives them of representation in the General Order through the district lodges and the Grand Lodge as contemplated by the constitution and by-laws of the order. It puts the control and management of the property and affairs of the Grand Lodge into the hands of officials and a board, freed from the general supervision and of the Supreme Lodge. In short, it would establish a wholly independent and different order than that which members within the state joined, and to which they promised allegiance. It cannot, we think, be claimed but that such a disaffiliation would operate to destroy

the contractual relations of members with the General Order and the benefits derived therefrom.

129 Misc. at 532, 222 N.Y.S. at 214. Applying this reasoning, the AFHR Directors' January 1994 declaration by itself could not and did not sever AFHR from the International Order; nor did it disenfranchise Ms. Bressler, Mr. Voirol, or any other AFHR members who did not agree with the board's intended change of course. *Cf. Sabourin v. Lippe*, 195 Mass. 470, 81 N.E. 282, 283 (1907) ("If it had been in the power of [the Court Samuel de Champlain, No. 49, of the Order of Foresters] to amend its laws in such a way as to legally sever its connection with the Order of Foresters, it could not do it without previous notice to the members that such a proposal was to be acted upon.").

As members of AFHR, Ms. Bressler and others retained the right under the By-Laws to call for a referendum on the board's action under Article XI, or even to seek the recall of the directors pursuant to Article X. (AFHR By-Laws, Arts. X, XI, Addendum vol. I, tab 2, at 34.) They could likewise propose amendments to the By-Laws under Article XII, presumably even an amendment making explicit the hierarchical relationship between AFHR and the International Order that they believed to exist. (*Id.* Art. XII, Addendum vol. I, tab 2, at 35; *see* note 15, *supra*.) All that would be required was the support of their fellow AFHR voting members, many of whom, the Bressler Plaintiffs insist, agreed with Ms. Bressler.[51]

---

[51]In their brief, the Bressler Plaintiffs assert that "when after secession the parties asked members to send in 'affirmations,' . . . plaintiffs received 154 affirmations, defendants received 120. A

(continued...)

In any event, the question of "secession" by the AFHR directors was rendered moot by the Supreme Council's pre-emptive exercise of its power to disaffiliate AFHR as a Federation of the International Order by revoking its Charter and the charters of its Lodges, presumably exercising the power granted it by Article 23 of the International Constitution.[52]  As described above, the district court found:

> The Supreme Council withdrew the charters of all lodges and "higher bodies in the Federation" until certain conditions were met, including a pledge not to belong to the "clandestine order at Larkspur" and the signing of a "reaffirmation of loyalty"which pledged the individual member "to support, maintain, respect and obey the International Constitution of the Order and the rules and decisions of the Supreme Council and its Representative."  Ex. JJ.

(FC&O at 11, App. vol. II, at 397.)  The Supreme Council thus carried out its threat to disaffiliate AFHR for not adopting the 1993 amendments—the amendments rejected by a substantial majority of AFHR's voting members.

It was only after revocation of AFHR's Charter pursuant to the International Constitution that the Bressler Plaintiffs and other AFHR members found themselves in "a wholly independent and different Order from that which members . . . joined, and to which they promised allegiance," *Di Silvestro*, 129 Misc. at 532, 222 N.Y.S. at 214, and

---

[51](...continued)
60% vote in <u>favor</u> of secession, the percentage required in an AFHR referendum, would have been extremely unlikely."  (Opening Brief at 40; *but see* Memorandum, dated March 7, 1994, Addendum, vol.II, tab 58, at 190 (11 out of 18 active lodges remain affiliated with AFHR).)

[52]Article 23 of the International Constitution provides: "The Supreme Council possesses the right to revoke the Charter of any Lodge or Federation for just and sufficient cause."  (International Constitution, Art. 23 [Ch. IV, Art. 6], Addendum vol. I, tab 1, at 3.)

then only because the Supreme Council of the International Order had ended its relationship with AFHR by its own hand, exercising the power granted it under the International Constitution.

However, even the Supreme Council's revocation of AFHR's charter did not alter the relationship of AFHR to its own members, or result in any forfeiture of AFHR's assets. The rights AFHR members to participate in AFHR and their interest in AFHR's property remained unchanged.

**The Supreme Council's Revocation of AFHR's Charter**

The revocation of AFHR's Charter did not operate to divest AFHR of the property that all parties concede it legally owns, and over which AFHR's By-Laws grant exclusive control to AFHR's Grand Council of Administration. While the International Constitution empowers the Supreme Council to grant and revoke charters of federations and lodges, nothing in that document provides that revocation of a federation's charter works a forfeiture of that federation's property to the International Order. Nor does such a forfeiture necessarily result from the revocation of a charter. *Vicksburg Lodge, No. 26 v. Grand Lodge of Free And Accepted Masons of Mississippi*, 116 Miss. 214, 76 So. 572 (1917), cited by the district court, speaks to this question:

> [The Grand Lodge] had the right, if it pursued it in the proper way and according to its rules and regulations, to sever the relations between it and the subordinate lodge and to cancel such rights it had conferred by virtue of the charter granted by it and by its rules and regulations. But it did not have the rights and power to take from the corporation created under the laws of the state its property without due process of law.

-62-

76 So. at 576.

In general, "If a subordinate lodge is incorporated, its legal existence is not affected by the fact that the supreme authority suspends or dissolves it or declares its charter forfeited, and in such case it is entitled to retain its funds and property as against the supreme body." 10 C.J.S. *Beneficial Associations* § 58, at 56 (1995) (footnote omitted; citing *Grand Lodge of Massachusetts, Loyal Orange Inst. v. Snow*, 266 Mass. 483, 165 N.E. 479 (1929)). In *Merrill Lodge, No. 299, I.O.G.T., v. Ellsworth*, 78 Cal. 166, 20 P. 399 (1889), the Grand Lodge of the Independent Order of Good Templars suspended the charter of the Merrill Lodge, No. 299, a subordinate lodge incorporated under the laws of California, and appointed a deputy to "take possession of the books, papers, and the other property of said Merrill Lodge, and hold the same subject to and until the further order of said Grand Lodge," which he did. The subordinate lodge sought and was granted injunctive relief against the Grand Lodge and its deputy. The Supreme Court of California affirmed:

> The question presented is one of property merely; and in relation to this two controlling facts appear from the record, *viz.*: that the plaintiff is a corporation duly organized under the laws of the state of California, and that it is the owner of the property in question, in which the defendants have no right, title, or interest. It follows from these facts that the plaintiff is entitled to be protected against the acts of the defendants. The ownership of the property draws to itself the right of possession and control. And since the plaintiff is a corporation it can only be dissolved in the manner prescribed by the laws of California. The provision of the constitution of the grand lodge that in certain contingencies the subordinate lodge 'shall be deemed an extinct lodge, and its charter shall be forfeited,' and the 'suspension' by the grand lodge, and the action taken by the grand chief

templar, have not the slightest effect upon the legal existence of the corporation; and as long as it exists its affairs must be managed by its duly-elected officers, as provided by law. If they misconduct themselves, appropriate proceedings to remove them must be resorted to. . . .

78 Cal. at 168, 20 P. at 400.

To conclude otherwise, the "contract" between the supreme order and the local lodge must authorize the forfeiture of the funds of the subordinate body, an example of "the well-known principle that forfeitures are not favored, and that, when the right of forfeiture is claimed under contract, the condition involving the forfeiture must be strictly interpreted against the party for whose benefit it is created," the supreme order. *Scott v. Donahue*, 93 Cal.App. 126, 269 P. 455, 457 (1928). Here, no such forfeiture provision is found within the four corners of the International Constitution, the AFHR Articles or By-Laws that would entitle the International Order or its "loyal" adherents to take possession of AFHR's corporate property, even assuming that the Supreme Council lawfully exercised its power to revoke AFHR's Charter pursuant to Article 23 of the International Constitution.

The district court found that AFHR "was formed with the declared intent of separating its legal or secular matters from its ritual or ceremonial aspects," and concluded that as to matters of corporate governance, the Bressler Plaintiffs' claims "proceed from the wrong premise that the Masonic structure controls . . . ." (FC&O at 19, App. vol. II, at 405, 406 (citing Exh. F, Minutes of First Meeting, dated August 10, 1975,

Addendum vol. II, tab 70).[53]) Recognizing, as did the district court, that AFHR's "articles and bylaws form the contract of membership," (*id.* at 16, App. vol. II, at 402), the contract in this case contemplates that AFHR owns and exercises exclusive control over AFHR property and finances, without direct control or supervision by the International Order, and this remains so even after the Supreme Council's revocation of AFHR's Charter in early 1994. As the district court concluded, the sequence of events recounted in detail during five days of bench trial left AFHR in essentially the same place after 1994 that it was in prior to 1994: in lawful and exclusive possession and control of its corporate property and funds.

### The Bressler Plaintiffs' Withrawal from AFHR

At trial—and again in briefing this appeal—the Bressler Plaintiffs have exhaustively detailed the sequence of meetings, events, and correspondence among the AFHR Directors and AFHR members both preceding and following the fateful January 20, 1994 meeting in Paris, leading to the "secession" of AFHR from the International

---

[53] In fact, AFHR's incorporators resolved in 1975 that "the ceremonial part of the Corporation be kept separate and apart from the legal aspects thereof . . . ." (Exh. F, Minutes of First Meeting, dated August 10, 1975, Addendum vol. II, tab 70, at 282.)

Arguing that the separation of ritual and corporate functions did not amount to a "secession," the Bressler Plaintiffs insist that AFHR did not "actually separate[] from the International Order" in 1975, and in fact that "the actual operation of AFHR for the next twenty years . . . powerfully demonstrates that AFHR continued as the American Branch of the International Order." (Reply Brief at 9, 10, 11.) "The fact that the consistory handled 'ritual' functions, while the grand council handled 'business' functions," the Bressler Plaintiffs submit, "is no more remarkable than the fact that many churches divide similar functions between a 'board of deacons' and a 'board of trustees.'" (*Id.* at 13 (citations omitted).)

Order.  They "urge that defendants' actions of refusing to amend its bylaws as dictated by the Council and dissociating AFHR from the International Order are, in effect, actions of disloyal members seceding from the organization and that such secessionists lose any interest in the property of the society." (*Id.* at 13, App. vol. II, at 399 (citations omitted).)

For their part, however, the Bressler Plaintiffs pursued none of the options available to them under the AFHR By-Laws to challenge or override the AFHR Directors' stated intentions or to remove the existing directors from office.  Instead, they opted to withdraw from AFHR and form their own federation, incorporated in Delaware in December of 1994 as the "Order of International Co-Free-Masonry Le Droit Humain American Federation," and to seek to obtain control of AFHR's property simply by asking for it, all with the approval of the International Order's Supreme Council.  (*See* Letter of Vera Bressler, dated January 31, 1994, Dfts' Exh. JJ, Addendum vol. II, tab 83, at 315-16; Letter of Serge Jacquens, dated February 18, 1994, Pltf's Exh. 89, Addendum vol. II, tab 56, at 183 (giving Representative Bressler "the power of taking all helpful conservatory steps on personal and real estate of the American Federation of Le Droit Humain (American Federation of Human Rights), the headquarters of which is in LARKSPUR (Colorado)").)  As the Supreme Council's Representative, Ms. Bressler decreed that "[a] member may not belong to Le Droit Humain and at the same time be a member of the Clandestine Order at Larkspur," and required that members "sign the enclosed Obligation of reaffirmation of Allegiance to the Supreme Council of

-66-

International Co-Masonry, Le Droit Humain," and return it to her "by March 6, 1994, [or they] will be automatically out of the Order." (Letter of Vera Bressler, dated January 31, 1994, Dfts' Exh. JJ, Addendum vol. II, tab 83, at 316.)

In effect, then, Ms. Bressler called upon AFHR members loyal to the Supreme Council to leave AFHR—the "Clandestine Order"—and reaffirm their affiliation with the International Order through herself and an "Administrative Committee" headed by plaintiff-appellant Voirol. (*Id.*) The "loyalist" members did as they were asked, and withdrew from participation in AFHR in favor of the Bressler Plaintiffs' new federation, the "Order of International Co-Free-Masonry Le Droit Humain – American Federation," which was soon recognized by the Supreme Council as the only American association with whom the International Order had any relationship. (App. vol. I, at 205, 206.)

The revocation of AFHR's charter by the Supreme Council did not result in the forfeiture of AFHR's property to the International Order, or to its loyal members or representatives. AFHR remained in existence as a Colorado non-profit corporation in lawful possession of its assets. Having withdrawn from membership in AFHR, the Bressler plaintiffs lost any interest they had in AFHR's property, and could not unilaterally transfer AFHR's property to their new Delaware corporation, be they "loyal" to the International Order or not. *See, e.g.*, *Supreme Lodge of The World, Loyal Order of Moose v. Los Angeles Lodge, No. 386, Loyal Order of Moose*, 177 Cal. 132, 138, 169 P. 1040, 1042 (1917) ("How can it be said the members who withdrew, thus severing their

connection with defendant lodge, obtained and paid for a new charter, and by authority of the Supreme Lodge organized a new one, constitute a remaining minority of defendant lodge?").[54]  Likewise, they cannot now use a claim of constructive trust to escape the consequences of their own withdrawal from AFHR membership.

**NOMINAL DAMAGES AGAINST APPELLANTS BRESSLER AND VOIROL ON CIVIL CONSPIRACY COUNTERCLAIM**

The district court awarded nominal damages against Vera Bressler and James Voirol on the defendants' counterclaim for civil conspiracy, dismissing the balance of the defendants' counterclaims.  Bressler and Voirol challenge that award as having been made without requisite proof of actual damage as required by Colorado law.

Defendants-appellees respond that the district court was correct in concluding that "[e]very element of interference with prospective business advantage and contract were established," and further, that the district court found actual damage resulting from Voirol's collection of an estimated $5,000 in AFHR membership dues.  (Answer Brief at 29-31.)

_____

[54]In the *Moose* case, the leader of the Supreme Lodge had revoked the charter of the defendant Los Angeles Lodge, Loyal Order of Moose, No. 386, and the Supreme Lodge sought to recover the defendant lodge's furnishings for the benefit of a minority of "loyal" members who had withdrawn from the defendant lodge and "formed a voluntary new lodge, assuming the name 'Los Angeles Lodge, Loyal Order of Moose, No. 386,' to which the Supreme Lodge issued a charter." 177 Cal. at 135, 169 P. at 1041.  The California Supreme Court concluded that absent the lawful forfeiture of lodge property pursuant to a forfeiture provision in the Supreme Lodge's bylaws, "the withdrawing members who organized the new lodge can have no just right to the property acquired and used by defendant lodge for lodge purposes."  177 Cal. at 139, 169 P. at 1043.

Appellants reply that the district court found that "there was no evidence to show that any defendant suffered any damage as a result of Voirol's actions," and that the alleged $5,000 diversion was insufficiently proven, and therefore speculative. (Reply Brief at 20 (quoting FC&O at 20, App. vol. II, at 406.)[55] Appellants reiterated their contention that proof of actual damage was a required element of a civil conspiracy counterclaim, citing *More v. Johnson*, 193 Colo. 489, 568 P.2d 437 (1977).

The district court reasoned that "proof of actual damages is not necessary" to liability for intentional interference with contractual relations, here Voirol's attempt (with Bressler's knowledge) to obtain control of AFHR's account at Dean Witter without lawful authority. (FC&O at 21, App. vol. II, at 407 (citing *Colorado Jury Instructions, 4th--Civil* § 24:6).)

In *Lockwood Grader Corp. v. Bockhaus*, 129 Colo. 339, 270 P.2d 193 (1954), five elements were stated to be essential to a civil conspiracy claim:

> To constitute a civil conspiracy there must be: (1) two or more persons, and for this purpose a corporation is a person; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof. The burden of proving these essentials by a preponderance of the evidence is upon him who asserts the claim under such circumstances.

*Id.*, 270 P.2d at 196. "In a civil conspiracy action, the conspiracy is not actionable per se.

---

[55]The district court did find that there was no evidence of actual damage and did conclude that "for me to award any damages" for the alleged diversion "would be speculation." (FC&O at 20, 22 n.17, App. vol. II, at 406, 408.) As to the $5,000 in dues, the district court recited that "[d]efendants estimated the amount of these dues to be $5,000." (*Id.* at 12, App. vol. II, at 398.)

Actual damages must be proved." *More v. Johnson*, 193 Colo. 489, 568 P.2d 437, 440 (1977) (citing *Morrison v. Goodspeed*, 100 Colo. 470, 68 P.2d 458 (1937)). *Accord Jet Courier Service, Inc. v. Mulei*, 771 P.2d 486, 502 (Colo. 1989) ("The essence of a civil conspiracy claim is not the conspiracy itself, but the actual damages resulting from it." (citing *More*)).

According to *Swartz v. Bianco Family Trust*, 874 P.2d 430, 434 (Colo. App. 1993), "The elements which must be established to recover damages for intentional interference with contract are contained in Restatement (Second) of Torts § 766 (1977). *Memorial Gardens, Inc. v. Olympian Sales & Management Consultants, Inc.*, 690 P.2d 207 (Colo. 1984)." Section 766, in turn, reads:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Comment t to Section 766 states: "The cause of action is for pecuniary loss resulting from the interference. Recovery may be had also for consequential harms for which the interference was a legal cause. (See s 774A)." This would suggest that actual damage—"pecuniary loss"—is intrinsic to the cause of action. Moreover, the model jury instruction cited by the district court itself appears to treat actual damage as the fifth required element of an interference with contract claim: the jury "must find" to "have been proved by a preponderance of the evidence: . . . "5. The defendant's interference

with the contract caused the plaintiff (damages) (losses)." *Colorado Jury Instructions, 4th--Civil* § 24:6.

Particularly in the context of a civil conspiracy claim, it appears that actual damage is an essential element, and the district court erred in concluding that liability for a civil conspiracy to interfere with contract may be imposed notwithstanding a failure of proof as to actual damage. Nominal damages thus appear to be unavailable in a claim for civil conspiracy under Colorado law absent proof of *some* actual damage to the claimant.

Here, the district court found that there was "no evidence to show that any defendant suffered any damage as a result of" appellants' actions. (FC&O at 20, App. vol. II, at 406.) The judgment against appellants Bressler and Voirol for nominal damages must, therefore, be reversed.

**DISMISSAL OF PLAINTIFF CORPORATION FOR LACK OF STANDING**

Prior to trial, the district court entered an order dismissing plaintiff "Order of International Co-Freemasonry Le Droit Humain, American Federation," a Delaware corporation formed by Ms. Bressler and others in December of 1994,[56] for lack of standing. (*See* Memorandum Opinion and Order, filed April 10, 1997, *Voirol v. Menocal*, 959 F. Supp. 1335 (D. Colo. 1997), App. vol. I, at 370-75.) Relying on the "constitutional minimum" for standing, that is, "(1) an injury-in- fact; (2) which is traceable to the allegedly unlawful conduct; and (3) which will likely be redressed by a

---

[56](*See* Certificate of Incorporation, Pltfs' Exh. 99, Addendum, vol. II, tab 62, at 201-03.)

favorable decision," the district court concluded that because the new corporation "was not in existence in January 1994," it "suffered no cognizable injury itself and will not be permitted to play the paladin." (*Id.*, 959 F. Supp. at 1338 (citing *Clajon Production Corp. v. Petera*, 70 F.3d 1566, 1572 (10th Cir. 1995)).)

Appellants, who were added as individual plaintiffs before the district court ruled on the standing issue, (*id.* at 1336 n.2), contend the district court erred in dismissing the new corporation. They argue that under the law governing the standing of associations, the new corporation could indeed "play the paladin"[57] and assert the claims of its members who are former members of AFHR still loyal to the International Order. (Opening Brief at 43-46; Reply Brief at 20-23.) They point to cases such as *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977), as authority for the proposition that "an organizational plaintiff may proceed on behalf of its members even if the organization itself lacked standing to proceed as an organization," and *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1 (1987), for the proposition that a non-profit corporation is an organization capable of suing on behalf of its members. (Opening Brief at 43-44.)

Defendants-Appellees respond that plaintiffs-appellants' claims pleaded in the Fourth Amended Complaint are essentially derivative in nature and are therefore

---

[57]A "paladin" is "any of the twelve legendary peers of Charlemagne's court," or "a knight or a heroic champion." *Webster's New World College Dictionary* 1036 (4th ed. 1999).

-72-

governed by Fed. R. Civ. P. 23.1.[58]  As to the standing of the new corporation, they argue

that "[t]here is no attempt to comply with F.R.C.P. 23.1" because the new corporation

was never a member of AFHR and was therefore ineligible to be a derivative plaintiff.

(Answer Brief at 34.)

Plaintiffs-Appellants' reply that they do not assert derivative claims, and that

"[d]irect actions may be brought by shareholders where, as here, the injury is to a defined

subclass of shareholder/members" or "where . . . there is a threatened diversion of

corporate assets."  (Reply Brief at 22-23 (citing *Security Natl. Bank v. Peters, Writer, and*

*Christensen, Inc.*, 569 P.2d 875 (Colo. 1977), and *Crouse-Hinds Co. v. InterNorth, Inc.*,

518 F. Supp. 390 (N.D.N.Y. 1980)).)

---

[58]Fed. R. Civ. P. 23.1 reads:

> In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege(1) that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law, and (2) that the action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort. The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association. The action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the court directs.

*Hunt* outlines a three-part test for deciding whether an association has standing to sue on behalf of its members. An association has standing when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." 423 U.S. at 343.

The first prong of the *Hunt* test is satisfied, plaintiffs-appellants argue, because the members of the new corporation, "as individuals, could have brought the suit in their name," (Opening Brief at 44), as in fact they did. As to the second and third prongs of the *Hunt* test, plaintiffs-appellants' briefs say nothing. At the district court, plaintiffs addressed the second prong rather obliquely, explaining that the new corporation was formed "solely to enable the loyal members to continue to administer financial affairs, and otherwise perpetuate the American branch International Co-Masonry." ("Plaintiff's Memorandum Opposing Defendants' Motion for Summary Judgment on Standing," filed December 4, 1995, at 15, App. vol. I, at 72 (citing Bressler Affidavit, ¶¶ 25-28)[59].) However, as to the third prong of *Hunt*—that neither the claim nor the remedy sought "requires the participation of individual members in the lawsuit"—plaintiffs offered no

---

[59]Ms. Bressler elaborated that the new corporation "is continuing to carry out the same work, in the same manner, and by the same rules, policies and same structure of governance as has been done by the American Federation of Human Rights before defendants' secession." (Affidavit of Vera Bressler, dated November 29, 1995, ("Bressler Aff."), at 8-9 ¶ 25, App. vol. I, at 159-60.)

argument to the district court, just as they have offered none here.[60]

In this instance, we are not inclined to make the appellants' argument for them.

The joinder of Ms. Bressler and others as individual plaintiffs asserting claims for themselves and on behalf of others effectively rendered the new corporation's presence redundant. Even if the "Order of International Co-Freemasonry Le Droit Humain, American Federation" could properly sue on their behalf, the individual plaintiffs' presence in the case "as rightful directors and members of AFHR and on behalf of the other American Federation members who have not seceded from International Co-Masonry," (Fourth Amended Complaint, filed April 7, 1997, at 2-3 ¶ 4, App. vol. I, at 307-08), effectively moots that question because their presence left the new corporation with no additional claim to assert or further relief to obtain.[61]

Thus, even if the district court erred by not explicitly applying the three-prong *Hunt* test as the proper measure of the new corporation's standing to represent Ms.

---

[60]The defendants-appellees insist that the Fourth Amended Complaint alleges derivative claims, *e.g.*, for breach of fiduciary duty, at least suggesting that those claims must be prosecuted by persons who were AFHR members in January 1994 and thereby aggrieved by the allegedly wrongful conduct. *See* Fed. R. Civ. P. 23.1 (requiring that "plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains . . . ."). Ms. Bressler and others respond that "[t]he Fourth Amended Complaint, unlike the original complaint, does not assert a derivative claim." (Reply Brief at 22.)

[61]Indeed, the relief sought in the Fourth Amended Complaint causes its own problems for the new corporation's standing, such as "an Order recognizing" the individual plaintiffs "as rightful directors of AFHR," (Fourth Amended Complaint at 2 ¶ 4, App. vol. I, at 307), or money damages. (*Id.* at 16 ¶ 67(f), App. vol. I, at 321.) *See, e.g.*, 1 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure* § 2.13(4), at 265 (3d ed. 1999) ("[T]he standing of an association to sue on behalf of its members and assert their rights depends on the nature of the relief sought.").

Bressler and others, that error proves to be harmless in the context of this litigation.

Plaintiffs had their day in court.

**CONCLUSION**

The district court correctly concluded that both before and after January 20, 1994, the American Federation of Human Rights, a Colorado nonprofit corporation, held lawful possession and exclusive control over its corporate property and funds, and that the plaintiffs had failed to meet their burden to prove that the corporate property was subject to an express trust for the benefit of the International Order of Co-Freemasonry or AFHR members who remained loyal to the International Order after the two entities parted ways. The district court likewise was correct in concluding that plaintiffs failed to prove that the defendant AFHR directors breached their fiduciary duties by giving effect to a vote of AFHR's eligible members rejecting amendments to AFHR's own By-Laws that the International Order insisted that AFHR adopt, and by declaring their intent to operate independently of the International Order in the face of a threat by the International Order to disaffiliate AFHR as a Co-Masonic federation for refusing to make those amendments. The defendants' statements in that regard in January 1994 were declaratory in effect, and did not operate to alter the relationship of plaintiffs as members of AFHR or diminish their lawful rights as members under AFHR's Articles and By-Laws to participate in corporate democracy. Concerning severance, the Supreme Council of the International Order revoked the charters of AFHR and its lodges—the operative event effectively

disaffiliating AFHR from the International Order. But disaffiliation did not dissolve AFHR or result in the forfeiture of its property to the International Order.

For their part, the Bressler Plaintiffs opted to withdraw from AFHR and form a new corporate federation—with the blessings of the International Order—rather than pursuing any of their remedies under the AFHR By-Laws to revisit the statements or actions of the directors to which they objected. Though the Bressler Plaintiffs did their best to paint AFHR and its directors as disloyal "secessionists," AFHR's corporate existence survived AFHR's disaffiliation from the International Order, and AFHR retains lawful possession and exclusive control of its own property, free of any trust or other interest in favor of the International Order or its "loyal" members who have left AFHR and are no longer its members.

The district court judgment dismissing plaintiffs-appellants' claims of express and constructive trust, breach of fiduciary duty and breach of contract is AFFIRMED. The district court's order dismissing plaintiff "Order of International Co-Freemasonry Le Droit Humain, American Federation," a Delaware corporation, is also AFFIRMED.

The district court erred in its application of the Colorado law of civil conspiracy, and its award of nominal damages against Vera Bressler and James Voirol is REVERSED.

Entered for the Court,


Bruce S. Jenkins
Senior District Judge

Judge McWilliams concurs in the judgment.